DAVID H. KRAMER, SBN 168452
MENG JIA YANG, SBN 311859
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dkramer@wsgr.com
Email: mjyang@wsgr.com

AMIT Q. GRESSEL, SBN 307663
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105-1126
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Email: agressel@wsgr.com

BRIAN M. WILLEN (*admitted pro hac*)
BENJAMIN D. MARGO (*admitted pro hac*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email: bwillen@wsgr.com
Email: bmargo@wsgr.com

STEFFEN N. JOHNSON (*admitted pro hac*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1700 K Street NW, Fifth Floor
Washington, DC 20006-3817
Telephone: (202) 973-8800
Facsimile: (202) 973-8899
Email: sjohnson@wsgr.com

Attorneys for Defendants
YOUTUBE, LLC and SUNDAR PICHAI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

DONALD J. TRUMP, KELLY VICTORY, AUSTEN FLETCHER, AMERICAN CONSERVATIVE UNION, ANDREW BAGGIANI, MARYSE VERONICA JEAN-LOUIS, NAOMI WOLF, and FRANK VALENTINE,

Plaintiffs,

v.

YOUTUBE, LLC and SUNDAR PICHAI,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: 4:21-cv-08009-JSW

**DEFENDANTS YOUTUBE, LLC AND SUNDAR PICHAI'S MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Hon. Jeffrey S. White

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    A.    YouTube's Terms of Service, Content Policies, and Editorial Judgments ............ 2

    B.    Plaintiffs and Their Content On YouTube .............................................................. 4

    C.    Procedural History ................................................................................................... 5

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

I.     PLAINTIFFS' FIRST AMENDMENT CLAIM FAILS AS A MATTER OF LAW ........ 7

    A.    YouTube Is A Private Entity, Not A State Actor .................................................... 7

    B.    Plaintiffs' Government Compulsion Theory Fails .................................................. 8

    C.    Plaintiffs Have Not Plausibly Alleged "Joint Action" ......................................... 13

    D.    Section 230 Does Not Make YouTube Into A State Actor ................................... 14

II.    PLAINTIFFS' CONSTITUTIONAL CHALLENGE TO SECTION 230 FAILS .......... 17

III.   PLAINTIFFS HAVE NO VIABLE CLAIM UNDER FDUTPA (COUNT THREE) ...... 18

    A.    The Choice-of-Law Provision Bars Plaintiffs' General FDUTPA Claim ............. 18

    B.    Plaintiffs' Claim That YouTube Acted Deceptively By Applying Its Moderation Rules Inconsistently Fails as a Matter of Law .................................. 20

IV.   PLAINTIFFS' CLAIM UNDER FLORIDA'S SSMCA FAILS (COUNT FOUR) ........ 23

    A.    The SSMCA Does Not Apply To Non-Floridians Or Retroactively ................... 24

    B.    The SSMCA Is Unconstitutional On Its Face ...................................................... 25

    C.    The SSCMA Is Unconstitutional As Applied To This Case ................................. 26

V.    SECTION 230 BARS PLAINTIFFS' STATE LAW CLAIMS SEEKING TO HOLD YOUTUBE LIABLE FOR ITS CONTENT-MODERATION CHOICES .......... 31

VI.   PLAINTIFFS' CLAIMS AGAINST MR. PICHAI MUST BE DISMISSED ................. 32

VII.  EQUITY AND THE FIRST AMENDMENT RULE OUT AN INJUNCTION ............. 33

CONCLUSION ................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abu-Jamal v. National Public Radio,*
  1997 U.S. Dist. LEXIS 13604 (D.D.C. Aug. 21, 1997) ..................................... 9

*ACLU v. Johnson,*
  194 F.3d 1149 (10th Cir. 1999) ........................................................... 31

*Am. Freedom Def. Initiative v. Lynch,*
  217 F. Supp. 3d 100 (D.D.C. 2016) ...................................................... 17

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
  526 U.S. 40 (1999) .................................................................. 13, 17

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................... 6

*Assocs. & Aldrich Co. v. Times Mirror Co.,*
  440 F.2d 133 (9th Cir. 1971) ........................................................ 13, 25, 34

*Atkinson v. Meta Platforms, Inc.,*
  2021 U.S. App. LEXIS 34632 (9th Cir. Nov. 22, 2021) ................................ 7, 8, 14

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ...................................................................... 11

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ..................................................................... 28

*Brazil v. Dell Inc.,*
  585 F. Supp. 2d 1158 (N.D. Cal. 2008) .................................................. 19

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
  531 U.S. 288 (2001) ...................................................................... 8

*Buentello v. Boebert,*
  2021 U.S. Dist. LEXIS 117825 (D. Colo. June 24, 2021) .................................. 9

*Cafasso v. Gen. Dynamics C4 Sys., Inc.,*
  637 F.3d 1047 (9th Cir. 2011) .......................................................... 20

*Carlin Communications, Inc. v. Mountain States Telephone and Telegraph Company,*
  827 F.2d 1291 (9th Cir. 1987) ....................................................... 10, 12

*Chi. Joint Bd, v. Chi. Tribune Co.,*
  435 F.2d 470 (7th Cir. 1970) ........................................................ 34, 35

*Children's Health Defense v. Facebook Inc.,*
  2021 U.S. Dist. LEXIS 121314 (N.D. Cal. June 29, 2021) ........................... *passim*

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.,*
  6 F.4th 1247 (11th Cir. 2021) .......................................................... 34

*Daniels Sharpsmart, Inc. v. Smith*,
    889 F.3d 608 (9th Cir. 2018)...................................................................30

*Daniels v. Alphabet Inc.*,
    2021 U.S. Dist. LEXIS 64385 (N.D. Cal. Mar. 31, 2021) .........................*passim*

*Davison v. Facebook, Inc.*,
    370 F. Supp. 3d 621 (E.D. Va. 2019)...................................................26

*Democratic Party of United States v. Wisconsin ex rel. La Follette*,
    450 U.S. 107 (1981) ...........................................................................28

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
    518 U.S. 727 (1996) ...........................................................................25

*Divino Grp. LLC v. Google LLC*,
    2021 U.S. Dist. LEXIS 3245 (N.D. Cal. Jan. 6, 2021) ..............................*passim*

*Doe v. Google LLC*,
    2021 U.S. Dist. LEXIS 201377 (N.D. Cal. Oct. 19, 2021) .........................*passim*

*FCC v. Fox TV Stations, Inc.*,
    567 U.S. 239 (2012) ...........................................................................29

*Fed. Agency of News LLC v. Facebook, Inc.*,
    432 F. Supp. 3d 1107 (N.D. Cal. 2020) ................................................7, 8, 13

*Freedom Watch, Inc. v. Google, Inc.*,
    816 F. App'x 497 (D.C. Cir. 2020) ........................................................7

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) (en banc)..................................................6, 33

*Gonzalez v. Google LLC*,
    2 F.4th 871 (9th Cir. 2021).................................................................31

*Great White N. Franchisee Ass'n-USA, Inc. v. Tim Hortons USA, Inc.*,
    2020 WL 8024349 (S.D. Fla. Dec. 18, 2020) ..........................................22

*Green v. AOL*,
    318 F.3d 465 (3d Cir. 2003).................................................................18

*Harris v. Quinn*,
    573 U.S. 616 (2014) ...........................................................................35

*Hassen v. State Farm Mut. Auto. Ins. Co.*,
    674 So. 2d 106 (Fla. 1996)...................................................................24

*Hauck v. Advanced Micro Devices, Inc.*,
    2019 WL 1493356 (N.D. Cal. Apr. 4, 2019) ..........................................20

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989) ...........................................................................30

*Heineke v. Santa Clara Univ.*,
    965 F.3d 1009 (9th Cir. 2020).............................................................7, 10, 11

*Herssein Law Grp. v. Reed Elsevier, Inc.*,
    2014 U.S. Dist. LEXIS 185972 (S.D. Fla. Mar. 5, 2014) ................................................. 19

*Hertz Corp. v. Accenture, LLP*,
    2019 U.S. Dist. LEXIS 185373 (S.D.N.Y Oct. 25, 2019) ............................................... 21

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, Inc.*,
    515 U.S. 557 (1995) ......................................................................................................... *passim*

*Idaho v. Coeur D'Alene Tribe*,
    794 F.3d 1039 (9th Cir. 2015) ......................................................................................... 34

*Janus v. AFSCME, Council 31*,
    138 S. Ct. 2448 (2018) ..................................................................................................... 16

*Johnson v. Knowles*,
    113 F.3d 1114 (9th Cir. 1997) ........................................................................................... 8

*Kennedy v. Deschenes*,
    2017 WL 2223050 (S.D. Fla. May 19, 2017) ................................................................. 22

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016) ......................................................................................... 16

*King v. Facebook, Inc.*,
    2019 U.S. Dist. LEXIS 151582 (N.D. Cal. Sept. 5, 2019),
    *aff'd*, 845 F. App'x 691 (9th Cir. 2021) .......................................................................... 32

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) ........................................................................................... 3

*La'Tiejira v. Facebook, Inc.*,
    272 F. Supp. 3d 981 (S.D. Tex. 2017) ...................................................................... 18, 26

*Lewis v. Google, LLC*,
    461 F. Supp. 3d 938 (N.D. Cal. 2020),
    *aff'd*, 851 F. App'x 723 (9th Cir.) ....................................................................... 7, 17, 18

*Librizzi v. Ocwen Loan Servicing, LLC*,
    120 F. Supp. 3d 1368 (S.D. Fla. 2015) .......................................................................... 20

*Lombardo v. Johnson & Johnson Consumer Cos.*,
    124 F. Supp. 3d 1283 (S.D. Fla. 2015) .......................................................................... 22

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982) ......................................................................................................... 15

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................................................................... 17

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019) .................................................................................................. *passim*

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ............................................................................................. 6

*Mathis v. Pac. Gas & Elec. Co.*,
    75 F.3d 498 (9th Cir. 1996)................................................................................. 14

*Mezey v. Twitter, Inc.*,
    2018 U.S. Dist. LEXIS 121775 (S.D. Fla. July 19, 2018) ............................... 32

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) .................................................................................*passim*

*Murphy v. Twitter, Inc.*,
    60 Cal. App. 5th 12 (2021) .............................................................................. 32

*NAACP v. Button*,
    371 U.S. 415 (1963) ....................................................................................... 30

*NetChoice v. Paxton*,
    No. 21-cv-00840-RP, slip op. (W.D. Tex Dec. 1, 2021)................................. 25

*NetChoice, LLC v. Moody*,
    2021 WL 2690876 (N.D. Fla. June 30, 2021)...............................24, 25, 26, 29

*Newman v. Google LLC*,
    2021 U.S. Dist. LEXIS 119101 (N.D. Cal. June 25, 2021) .......................*passim*

*Palomino v. Facebook, Inc.*,
    2017 WL 76901 (N.D. Cal. Jan. 9, 2017) ...................................................... 19

*Parker v. PayPal, Inc.*,
    2017 U.S. Dist. LEXIS 130800 (E.D. Pa. Aug. 16, 2017)............................. 18

*Pasadena Republican Club v. W. Justice Ctr.*,
    985 F.3d 1161 (9th Cir. 2021)........................................................................ 13

*Perfect 10, Inc. v. CCBill LLC*,
    481 F.3d 751 (9th Cir. 2007).......................................................................... 31

*Perret v. Wyndham Vacation Resorts, Inc.*,
    889 F. Supp. 2d 1333 (S.D. Fla. 2012)......................................................... 21

*Person v. N.Y. Post Corp.*,
    427 F. Supp. 1297 (E.D.N.Y. 1977)................................................................ 34

*Pfeister v. Rsui Indem. Co.*,
    2020 U.S. Dist. LEXIS 146474 (N.D. Cal. July 7, 2020) ................................ 6

*Prager Univ. v. Google LLC*,
    951 F.3d 991 (9th Cir. 2020)..................................................................7, 8, 21

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ....................................................................................... 28

*Roberts v. AT&T Mobility LLC*,
    877 F.3d 833 (9th Cir. 2017).......................................................................*passim*

*Ry. Emps.' Dep't v. Hanson*,
    351 U.S. 225 (1956) ....................................................................................... 16

1    *Salt Lake Trib. Publ'g Co. v. AT&T Corp.*,
2            320 F.3d 1081 (10th Cir. 2003) ................................................................. 33

3    *Sam Francis Foundation v. Christies, Inc.*,
             784 F.3d 1320 (9th Cir. 2015) (en banc) ........................................... 30, 31

4    *Sammartano v. First Judicial Dist. Ct.*,
             303 F.3d 959 (9th Cir. 2002) ................................................................... 35
5
     *Sherman v. PremierGarage Sys., LLC*,
6            2010 U.S. Dist. LEXIS 77392 (D. Ariz. July 30, 2010) ............................ 19

7    *Skinner v. Railway Labor Executives' Association*,
             489 U.S. 602 (1989) ......................................................................... 15, 16
8
     *Sol. Z v. Alma Lasers, Inc.*,
9            2013 WL 1246356 (S.D. Fla. Jan. 22, 2013) .......................................... 22

10   *Sutton v. Providence St. Joseph Med. Ctr.*,
             192 F.3d 826 (9th Cir. 1999) ............................................................ 12, 15
11
     *Thompson v. P&G*,
12           2018 U.S. Dist. LEXIS 179888 (S.D. Fla. Oct. 19, 2018) ......................... 21

13   *Turner Broad. Sys., Inc. v. FCC*,
             512 U.S. 622 (1994) ........................................................................ 25, 28
14
     *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*,
15           2016 U.S. Dist. LEXIS 195735 (S.D. Fla. Feb. 16, 2016) ......................... 20

16   *Victory Processing, LLC v. Fox*,
             937 F.3d 1218 (9th Cir. 2019) ................................................................. 28
17
     *Wiggins v. Hartford Ins. Co. of the Midwest*,
18           2007 WL 9702712 (S.D. Fla. Oct. 22, 2007) .......................................... 24

19   *Williams v. Facebook, Inc.*,
             384 F. Supp. 3d 1043 (N.D. Cal. 2018) ................................................... 19
20
     *Wilton v. Seven Falls Co.*,
21           515 U.S. 277 (1995) ............................................................................... 17

22   *Winter v. Facebook, Inc.*,
             2021 U.S. Dist. LEXIS 224836 (E.D. Miss. Nov. 22, 2021) ..................... 18
23
     *Winter v. NRDC, Inc.*,
24           555 U.S. 7 (2008) .................................................................................... 6

25   *Zhang v. Baidu.com Inc.*,
             10 F. Supp. 3d 433 (S.D.N.Y. 2014) ................................................. 26, 27
26
     *Zlotnick v. Premier Sales Grp., Inc.*,
27           431 F. Supp. 2d 1290 (S.D. Fla. 2006) .................................................... 22

28

1

**STATUTES & RULES**

2  47 U.S.C. § 230 ....................................................................................................*passim*

3  Fed. R. Civ. P. 9(b).............................................................................................. 20

4  Fed. R. Civ. P. 12(b)(6) ..................................................................................... 1, 6

5  Fla. Stat. Ann. § 501.211 ..................................................................................... 22

6  Fla. Stat. Ann. § 501.2041 .................................................................... 23, 24, 26

7  Florida Deceptive and Unfair Trade Practices Act .........................................*passim*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION TO DISMISS

**PLEASE TAKE NOTICE** that Defendants YouTube, LLC and Sundar Pichai (collectively, "YouTube") move this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing Plaintiffs' First Amended Complaint with prejudice. The motion is based upon this Notice of Motion and Motion; the Memorandum of Points and Authorities in support thereof; the Proposed Order filed concurrently herewith; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters properly before the Court.

## STATEMENT OF ISSUES AND REQUESTED RELIEF

Pursuant to Rule 12(b)(6), YouTube requests that the Court dismiss Plaintiffs' First Amended Complaint with prejudice for failure to state a claim. In addition, YouTube requests that the Court deny Plaintiffs' motion for a preliminary injunction.

## MEMORANDUM OF POINTS AND AUTHORITIES

Former President Trump and seven other Plaintiffs are attempting to turn their disagreement with YouTube's editorial choices into a federal lawsuit on behalf of a putative nationwide class. This effort fails as a matter of law. By seeking to treat the judgments of a private online service provider as state action, Plaintiffs flip the First Amendment on its head. They misuse the Declaratory Judgment Act to mount a baseless constitutional attack on Section 230 of the Communications Decency Act. And they improperly invoke Florida law to try to override YouTube's own choices about what material belongs on its service. Mr. Trump also moves for a sweeping injunction that would force YouTube to provide him with a free and unregulated platform for his speech—a request that is improper on its own terms and that would conflict with YouTube's own First Amendment rights.

The issues raised by this case are neither new nor difficult. In recent years, courts have confronted a series of lawsuits brought by users of online services complaining under various theories about the removal or restriction of their content. Each of those claims has been rejected—for the exact reasons that doom Plaintiffs' latest version of these theories:

- As the Ninth Circuit has expressly held, YouTube is not a state actor whose editorial choices are constrained by the First Amendment. It is a private company with its own right to decide what material to disseminate and on what terms. When litigants have tried to get around these principles by claiming, as Plaintiffs do here, that YouTube and

other private online services have somehow been coerced by members of Congress or acted jointly with the government, an unbroken line of cases has dismissed those claims.

- Courts have also consistently rejected similar efforts to challenge the constitutionality of Section 230, both because plaintiffs lack standing to seek a declaratory judgment against an affirmative defense and because this longstanding immunity does not transform private parties into state actors or itself restrict any speech.

- Plaintiffs' general claim under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") fails for multiple reasons: it is barred by the governing choice-of-law provision; Plaintiffs fail to allege any viable theory of deception; and the only relief Plaintiffs seek is a sweeping injunction prohibited by the First Amendment.

- Plaintiffs' claims under a new Florida statute that requires online services to apply editorial standards "in a consistent manner" (without defining what that means) fail both because it does not apply to non-Florida residents or to claims that arose before its effective date and because—as a federal court has already found—the statute is blatantly unconstitutional. Plaintiffs' effort to apply that law to override YouTube's editorial choices is barred by the First Amendment, due process, and the Commerce Clause.

- Under established law, Plaintiffs' state-law claims, which seek to hold YouTube liable for its decisions about what content to publish, are barred by Section 230.

These defects also rule out the preliminary injunction that former President Trump seeks. It is not merely that Plaintiff has no likelihood of success on the merits. Mr. Trump waited more than seven months after YouTube suspended his account to first seek an injunction—confirming the lack of urgency and absence of irreparable harm. In fact, it is YouTube that would face irreparable injury if forced to publish (and thus effectively subsidize) Mr. Trump's speech. Such an unprecedented injunction would violate YouTube's First Amendment right to exercise editorial control over the speech that appears on its private forum.

Plaintiffs' claims should be dismissed with prejudice, and former President Trump's motion for a preliminary injunction should be denied.

## BACKGROUND

### A.    YouTube's Terms of Service, Content Policies, and Editorial Judgments

YouTube hosts and makes available a vast array of user-created videos and other content. Declaration of Alexandra Veitch ("Veitch Decl.") ¶ 3. While YouTube hosts a wide diversity of material and aims to showcase a wide spectrum of human thought and creativity, the service is not—and never has been—a free-for-all. YouTube has always made choices about what content is welcome and what material it does not wish to display to its users (or certain segments of them).

1   To that end, YouTube sets standards for its community—including rules specifying the content

2   YouTube prohibits, restricts to certain age groups, or does not allow to be monetized.

3       These standards, known as the Community Guidelines, are incorporated into the Terms of

4   Service ("TOS") that all users must accept before creating channels or posting videos on YouTube.

5   Veitch Decl. ¶ 7 & Ex.; *see also* Transfer Order (Dkt. 70) at 5 ("[T]he Plaintiffs have all agreed to

6   the TOS.").[1] Under those rules, YouTube expressly retains discretion to apply its editorial

7   judgment and remove material and users from its service. The TOS provide that "YouTube is under

8   no obligation to host or serve Content." Veitch Decl. Ex. The TOS also state that "[i]f [YouTube]

9   reasonably believe[s] that any Content is in breach of this Agreement or may cause harm to

10  YouTube, our users, or third parties, we may remove or take down that Content in our discretion."

11  *Id*. Similarly, YouTube retains the express right to suspend or bar any user who it "believe[s]" has

12  violated YouTube's rules or posted banned material to the platform: "YouTube may suspend or

13  terminate your access, your Google account, or your Google account's access to all or part of the

14  Service if . . . we believe there has been conduct that creates (or could create) liability or harm to

15  any user, other third party, YouTube or our Affiliates." *Id*.

16      The Community Guidelines describe various categories of material not welcome on

17  YouTube. Veitch Decl. ¶ 8. Three of the Guidelines are especially relevant here. YouTube's policy

18  on elections misinformation applies to "[c]ontent that advances false claims that widespread fraud,

19  errors, or glitches changed the outcome of select past national elections, after final election results

20  are officially certified." *Id*. YouTube's policy on violent or graphic content forbids posts that

21  "[i]ncite others to commit violent acts against individuals or a defined group of people." *Id.*

22  YouTube's COVID-19 misinformation policy covers "content that spreads medical

23  misinformation that contradicts local health authorities' (LHA) or the World Health Organization's

24  (WHO) medical information about COVID-19." *Id.*

25      YouTube designs and enforces its policies with the goal of balancing open, free expression

26  _____

27      [1] Citations to "TOS" are to the Exhibit attached to the Declaration of Alexandra Veitch. YouTube's TOS and Community Guidelines are expressly referenced in the Amended Complaint ("AC") (*e.g.*, ¶¶ 37-41, 270), and those documents may be considered in deciding YouTube's

28  motion to dismiss. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

on its platform with the desire to protect users from harmful, misleading, or dangerous content. *Id.* ¶ 4. To that end, YouTube's decisions about which content to display reflect its values about the kind of community it wishes to foster. *Id.* ¶ 6. YouTube's policies also continually evolve over time to account for new forms of content and changing social circumstances. *Id.* ¶¶ 18, 20. Applying these nuanced policies often involves difficult judgment calls. For instance, YouTube may permit a video that would otherwise violate the Community Guidelines if it has educational, documentary, scientific, or artistic value. *Id.* ¶ 21. The difficulty of these nuanced judgments is compounded by the sheer volume of content posted on YouTube: in just the first quarter of 2021, YouTube removed over 9 million videos for violations of the Community Guidelines. *Id.* ¶ 14. While YouTube strives to apply its policies in a fair and even-handed way, perfection is not possible. That is one reason why YouTube allows users to appeal moderation decisions. *Id.* ¶ 16.

### B.    Plaintiffs and Their Content On YouTube

Plaintiffs—former President Donald Trump and seven others—are users of YouTube. Their lawsuit arises from YouTube's removal of certain of Plaintiffs' videos and its suspension of some of Plaintiffs' account privileges. AC ¶¶ 164, 167-68, 173-230.

Mr. Trump's grievance revolves around "his official YouTube channel," which he "used . . . to engage with the general public" and for national political purposes. AC ¶ 48. YouTube removed a video he posted on January 6, 2021, about the attack on the United States Capitol on that date, on the ground that it included false information about the outcome of the 2020 election. AC ¶¶ 96, 164. On January 12, 2021, YouTube removed additional videos. AC ¶¶ 165-66. The next day, YouTube suspended Mr. Trump's ability to upload new videos for seven days; YouTube later extended that suspension indefinitely. AC ¶¶ 6, 167-69. Plaintiffs allege that these actions were taken "at the behest of, in cooperation with, and the approval of, Democrat lawmakers" in Congress. AC ¶ 9. As for the other named Plaintiffs, each operated a channel on YouTube, posted various videos, and faced content-moderation actions by YouTube, such as removal or "demonetization" of certain of their videos. AC ¶¶ 173-234. This content ranges from "a video discussing election fraud in the state of Georgia" (AC ¶ 175), to videos discussing COVID-19 (AC ¶¶ 185, 207), to material about the "importance of the Second Amendment" (AC ¶ 195).

C.    **Procedural History**

On July 7, 2021, Plaintiffs filed this lawsuit against YouTube and the CEO of its parent company, Sundar Pichai, in the U.S. District Court for the Southern District of Florida (Dkt. 1). The first iteration of the complaint, on behalf of former President Trump and two other co-plaintiffs, asserted two federal claims: (1) a claim that YouTube violated Plaintiffs' First Amendment rights (Compl. ¶¶ 235-54); and (2) a claim seeking a declaratory judgment that 47 U.S.C. § 230 ("Section 230") is unconstitutional (Compl. ¶¶ 126-51).

On July 27, 2021, Plaintiffs filed the operative Amended Complaint (Dkt. 21), which carries forward the same First Amendment and declaratory judgment claims (AC ¶¶ 235-66), while adding five new plaintiffs and two new causes of action under Florida law. Plaintiffs' state law claims are asserted under (1) the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (AC ¶¶ 267-82) and (2) a new law—the "Stop Social Media Censorship Act" ("SSMCA")—enacted in May 2021, which purports to prohibit certain content-moderation decisions by online "social media platforms" (AC ¶¶ 283-301). Plaintiffs demand damages, along with injunctive relief ordering YouTube to reverse its moderation decisions, remove "warning labels and misclassification" of their content, and impose a monitor to ensure YouTube "consistently appl[ies]" its standards. AC at 70 (Prayer for Relief); *see also* AC ¶ 282.

On August 23, 2021—more than *six weeks* after his initial complaint was filed and more than *seven months* after his account was suspended—former President Trump, on his own behalf, moved for a preliminary injunction. Dkt. 43 ("PI"). The motion asks this Court to order YouTube, among other things, to immediately "reinstate Plaintiff's access to his YouTube channel," lift the ban on "certain uploaded videos," and "permit Plaintiff's sale of merchandise on his channel[.]" *Id.* at 30 (Request for Relief). Plaintiff filed this motion without having served the Amended Complaint on YouTube or Mr. Pichai. Indeed, Plaintiffs made no effort to serve the complaint (or their motion for a preliminary injunction) until August 27, 2021.

Once served, Defendants filed a motion to transfer the case to this Court based on the governing forum-selection clause in YouTube's TOS. Dkt. 64. Judge Moore granted YouTube's motion to transfer on October 6, 2021, holding that "the forum-selection clause in this case is

1   mandatory" and enforceable. Dkt. 70 at 12. The court specifically rejected Plaintiffs' arguments

2   that the TOS could not be applied to Mr. Trump because of his status as the former President (*id*.

3   at 7-10) and that enforcement of the forum-selection clause to the FDUTPA claims contravened

4   "public policy" (*id*. at 15-17). Following transfer, Plaintiffs stipulated that this Court should treat

5   the preliminary injunction motion (Dkt. 43) "in its present form" as "re-filed in this Court" and set

6   a briefing schedule on Defendants' combined motion to dismiss the Amended Complaint and

7   opposition to the preliminary injunction motion. Dkts. 101, 103.

8   **LEGAL STANDARD**

9       To survive a motion under Rule 12(b)(6), "[t]hreadbare recitals of the elements of a cause

10   of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S.

11   662, 678 (2009). "Mere conclusory allegations of law and unwarranted inferences are insufficient

12   to defeat a motion to dismiss." *Newman v. Google LLC*, 2021 U.S. Dist. LEXIS 119101, at *13

13   (N.D. Cal. June 25, 2021). Nor must a court accept "unwarranted deductions of fact, or

14   unreasonable inferences." *Divino Grp. LLC v. Google LLC*, 2021 U.S. Dist. LEXIS 3245, at *11

15   (N.D. Cal. Jan. 6, 2021).

16       A motion for preliminary injunction is an "extraordinary remedy" that is "never awarded

17   as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary

18   injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer

19   irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

20   and that an injunction is in the public interest." *Id.* at 20. The "purpose of a preliminary injunction

21   is to preserve the status quo." *Pfeister v. Rsui Indem. Co.*, 2020 U.S. Dist. LEXIS 146474, at *7

22   (N.D. Cal. July 7, 2020) (cleaned up). Here, Mr. Trump seeks to upend the status quo: his motion

23   asks this Court to reverse moderation decisions made by YouTube months before he filed suit. PI

24   at 29-30. Mr. Trump thus seeks a "mandatory injunction." *Marlyn Nutraceuticals, Inc. v. Mucos*

25   *Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). That makes his burden "doubly

26   demanding": he "must "establish that the law and facts *clearly favor* [his] position." *Garcia v.*

27   *Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

28

1

**ARGUMENT**

Plaintiffs' claims fail as a matter of law and must be dismissed. For similar reasons, former President Trump's motion for a preliminary injunction must be denied. He has no likelihood of success on the merits, and the mandatory injunction he seeks is both unsupported by the governing equitable factors and would violate the First Amendment.

**I.      PLAINTIFFS' FIRST AMENDMENT CLAIM FAILS AS A MATTER OF LAW**

Plaintiffs' lead claim is that YouTube violated their First Amendment rights by removing their videos or suspending their rights to upload content. AC ¶¶ 249-50; PI at 3-15. But YouTube is not a state actor, and its exercise of editorial discretion over its private service does not implicate Plaintiffs' First Amendment rights. This Court need not break new ground to reach that conclusion. In a series of recent cases, users have brought virtually identical claims against YouTube and other online services. Those claims have been uniformly rejected.[2] Indeed, the Ninth Circuit has squarely held that "the state action doctrine precludes constitutional scrutiny of YouTube's content moderation pursuant to its Terms of Service and Community Guidelines." *Prager Univ. v. Google LLC*, 951 F.3d 991, 999 (9th Cir. 2020). This case is no different.

**A.      YouTube Is A Private Entity, Not A State Actor**

Because the First Amendment "does not prohibit *private* abridgement of speech," *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019), a "threshold requirement" of any First Amendment claim "is the presence of state action." *Roberts v. AT&T Mobility LLC*, 877 F.3d 833, 837 (9th Cir. 2017). "YouTube is a private entity" (*Prager*, 951 F.3d at 996), and courts must "begin 'with the presumption that private conduct does not constitute governmental action.'" *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1012 (9th Cir. 2020).

---

[2] *See, e.g.*, *Atkinson v. Meta Platforms, Inc.*, 2021 U.S. App. LEXIS 34632, at *1-2 (9th Cir. Nov. 22, 2021); *Freedom Watch, Inc. v. Google, Inc.*, 816 F. App'x 497, 499 (D.C. Cir. 2020); *Doe v. Google LLC*, 2021 U.S. Dist. LEXIS 201377, at *19 (N.D. Cal. Oct. 19, 2021); *Newman*, 2021 U.S. Dist. LEXIS 119101, at *30-31; *Daniels v. Alphabet Inc.*, 2021 U.S. Dist. LEXIS 64385, at *21 (N.D. Cal. Mar. 31, 2021); *Divino*, 2021 U.S. Dist. LEXIS 3245, at *22; *Lewis v. Google, LLC*, 461 F. Supp. 3d 938, 952-53 (N.D. Cal. 2020), *aff'd*, 851 F. App'x 723 (9th Cir. 2021), *cert. denied*, 2021 U.S. LEXIS 5397 (Nov. 1, 2021); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1121-27 (N.D. Cal. 2020) ("*FAN*"); *Children's Health Defense v. Facebook Inc.* ("*CHD*"), 2021 U.S. Dist. LEXIS 121314, at *22 (N.D. Cal. June 29, 2021).

In such cases, "state action may be found if, *though only if*, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (emphasis added) (cleaned up). *Halleck* reaffirmed that only in limited scenarios can state action be found based on the conduct of a private entity: "(i) when the private entity performs a traditional, exclusive public function"; "(ii) when the government compels the private entity to take a particular action," or "(iii) when the government acts jointly with the private entity." 139 S. Ct. at 1928. These exceptions must be narrowly construed, as "[e]xpanding the state-action doctrine beyond its traditional boundaries would expand governmental control while restricting individual liberty and private enterprise." *Id.* at 1934.

In this case, the first scenario is categorically barred by *Prager*'s holding that YouTube is not engaged in an "exclusively public function." 951 F.3d at 995, 997-98. Plaintiffs instead rely on the compulsion and joint action tests. AC ¶¶ 63-77 (compulsion), ¶¶ 110-58 (joint action); PI at 6-9 (compulsion), 12-13 (joint action). Plaintiffs also suggest that Section 230 gives "significant encouragement to censor constitutionally protected speech," thereby transforming private content moderation into state action. PI at 9-11. None of these theories is viable. *See Atkinson*, 2021 U.S. App. LEXIS 34632, at *2-4 (rejecting compulsion, joint action, and Section 230 theories); *CHD*, 2021 U.S. Dist. LEXIS 121314, at *30-46 (same); *Doe*, 2021 U.S. Dist. LEXIS 201377, at *5-17 (compulsion, joint action); *FAN*, 432 F. Supp. 3d at 1124-27 (joint action); *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *15-20 (same); *Newman*, 2021 U.S. Dist. LEXIS 119101, at *28-30 (Section 230); *Divino*, 2021 U.S. Dist. LEXIS 3245, at *15-21 (same).

**B.     Plaintiffs' Government Compulsion Theory Fails**

State action under a compulsion theory occurs "when the government compels the private entity to take a particular action." *Halleck*, 139 S. Ct. at 1928. There is nothing like that here.

***No Government Coercion***. For starters, Plaintiffs do not allege anything like true government coercion. Plaintiffs must identify some "state regulation or custom having the force of law that compelled, coerced, or encouraged the Defendants to discriminate against the Plaintiffs." *Johnson v. Knowles*, 113 F.3d 1114, 1120 (9th Cir. 1997). Here, however, Plaintiffs

rely on public statements of members of Congress. AC ¶¶ 63-71; PI at 8-9, 11. It is doubtful even that such statements are themselves state action. "Congress, not its individual members, commands the federal government, and it is that body that the First Amendment sought to constrain." *Buentello v. Boebert*, 2021 U.S. Dist. LEXIS 117825, at *13 (D. Colo. June 24, 2021). Its "individual members, unlike executive branch officials, generally do not have authority to act on behalf of the state." *Id.* at *11. Those members do not exercise such authority when they express opinions about what social media platforms should do (AC ¶ 67)—nor does "Michelle Obama, the former First Lady" (*id.* ¶ 65). *See Buentello*, 2021 U.S. Dist. LEXIS 117825 at *13 ("Individual legislators do not have the constitutional power to either make law or abridge speech, and thus their individual actions are not within the First Amendment's coverage.").

Even beside this threshold problem, public statements by individual legislators cannot transform private parties into state actors. That theory has been repeatedly rejected. *Abu-Jamal v. National Public Radio*, 1997 U.S. Dist. LEXIS 13604 (D.D.C. Aug. 21, 1997), *aff'd*, 1998 U.S. App. LEXIS 15476 (D.C. Cir. July 8, 1998), held that NPR's refusal to broadcast the plaintiff's political commentary did not violate the First Amendment. The plaintiff alleged that Senator Dole (and other members of Congress) had called NPR "in attempts to pressure it not to air the program" and threatened to restrict its funds. *Id*. at *16-17. But, as the court explained, "not one of these people has any legal control over NPR's actions," and such pressure "simply does not mean that NPR's choice in law not to air Jamal's broadcast was that of the government." *Id*. at *17.

Similarly, Judge DeMarchi in *Daniels* dismissed a claim—virtually identical to Plaintiffs'—that public pressure by Speaker Pelosi and Congressman Schiff transformed YouTube's decision to remove a user's videos into state action. 2021 U.S. Dist. LEXIS 64385, at *7-11, *15-20. The plaintiff could not "plausibly allege that Speaker Pelosi and Rep. Schiff have legal control over defendants' actions" (*id*. at 17) or that "Congressional representatives may exert pressure on an industry without passing a law that may then be deemed government action" (*id.* at *19). Simply put: "The publicly expressed views of individual members of Congress—regardless of how influential—do not constitute 'action' on the part of the federal government." *Id*. at *16. It could hardly be otherwise: members of Congress often criticize the editorial choices of

1   newspapers, broadcasters, movie studios, and social media networks. If such criticism rendered

2   any response "state action," it would "eviscerate" those "private entities' rights to exercise editorial

3   control over speech and speakers on their properties or platforms." *Halleck*, 139 S. Ct. at 1932.

4          While this alone defeats Plaintiffs' claim, their theory also fails because the statements they

5   point to are not sufficiently coercive to create state action. Most of what Plaintiffs identify are

6   simply expressions of individual legislators' beliefs that social media companies should do

7   something about Mr. Trump's Facebook or Twitter accounts or about general categories of

8   objectionable content such as "misinformation and disinformation." AC ¶ 67. The remaining

9   statements are general musings about possible changes to Section 230 or the antitrust laws. *Id*.

10  None of this involved any specific threat—let alone one aimed at YouTube. Nevertheless,

11  Plaintiffs generally allege that these statements implied that "Democrat legislators" might convene

12  "public hearings" or subpoena testimony or potentially vote in favor of "new regulations and

13  removing Section 230 immunity." AC ¶¶ 68-69, 71-73. That is nowhere near enough. As the Ninth

14  Circuit has made clear: "That a private actor's conduct is subject to penalties ... is also insufficient

15  to convert private action into that of the state." *Heineke*, 965 F.3d at 1014. Applying that rule,

16  Judge Freeman found that allegations that mirror Plaintiffs'—that YouTube removed the

17  plaintiff's videos "in response to the threat of various government penalties—the repeal of CDA

18  Section 230 protections, 'show trials' in front of the U.S. Senate, and a DOJ antitrust suit against

19  Google"—could not support a First Amendment claim. *Doe*, 2021 U.S. Dist. LEXIS 201377, at

20  *9-12. "Plaintiffs can point to no authority to support a compulsion theory of state action based on

21  penalties, particularly 'threats' as speculative as the ones they point to here." *Id*. at *10.

22         The same is true here. The rare cases finding actual coercion typically involve specific

23  threats by law enforcement or other executive branch actors authorized to exercise direct authority

24  over private entities—typically threats of criminal prosecution. For example, in *Carlin*

25  *Communications, Inc. v. Mountain States Telephone and Telegraph Company*, 827 F.2d 1291,

26  1293, 1295 (9th Cir. 1987), a prosecutor threatened to bring criminal charges against a public

27  telephone utility, under a state law prohibiting distribution of sexually explicit material to minors,

28  if it did not terminate a specific entity's adult message service. *Id*. In this case, by contrast, there

were no threats of criminal (or even civil) enforcement actions, and "speculative assertions about the possibility defendants will be subpoenaed to testify before Congress or exposed to some other peril if they ignore letters from Congressional representatives do not support a theory of government action." *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *18; *accord CHD*, 2021 U.S. Dist. LEXIS 121314, at *43-46 (allegations that Congressman's public statements "coerced Facebook to take action on vaccine misinformation or risk losing certain immunities under Section 230" are "a far cry from the specific threats in *Carlin*"). Nor is there any law on the books that could even arguably support such enforcement; "the main 'threat' Plaintiffs allege is the *repeal* of a law." *Doe*, 2021 U.S. Dist. LEXIS 201377, at *11 (emphasis added). That is not enough. *Id.* at *11-12.

**Lack of specificity**. There is a separate problem with Plaintiffs' theory. Coercion requires that the "government commanded a particular result in, or otherwise participated in, [plaintiff's] *specific case*." *Heineke*, 965 F.3d at 1014 (emphasis added). YouTube thus must have been forced to make the particular decisions that Plaintiffs challenge. *E.g.*, *Doe*, 2021 U.S. Dist. LEXIS 201377, at *7-9 (rejecting claim where none of the supposedly coercive statements "mention Plaintiffs' names, their YouTube or Google accounts, their channels, or their videos"); *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *20-21 (same); *CHD*, 2021 U.S. Dist. LEXIS 121314, at *45 (same). This rule easily disposes of the non-Trump Plaintiffs' claims. The complaint identifies no statements that even mentioned those Plaintiffs or their content, much less sought to pressure YouTube to take action on their specific cases. AC ¶¶ 63-77; *accord* AC ¶¶ 108-56, 173-234. These Plaintiffs allege exactly the kinds of "broad lawmaker proclamations regarding 'misinformation'" that are insufficient "to show that the government 'commanded' the suspension of Plaintiffs' accounts." *Doe*, 2021 U.S. Dist. LEXIS 201377, at *8.[3]

**Private Party Defendant**. Even if Plaintiffs had adequately alleged government coercion, they would face another obstacle: they sued the wrong party. Most state compulsion cases are suits against the *government* challenging actions carried out by private parties. *See, e.g.*, *Bantam Books,*

---

[3] While Mr. Trump does point to a few statements mentioning him (AC ¶ 67), none of those made any reference to his YouTube channel or to videos he posted to YouTube—much less purported to "command" YouTube to take actions in regard to that channel.

*Inc. v. Sullivan*, 372 U.S. 58, 68 (1963); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 836-38 (9th Cir. 1999). And the Ninth Circuit has made clear that the coercion rule applies differently "in a case involving a private defendant." *Sutton*, 192 F.3d at 838. In such cases, "the mere fact that the government compelled a result does not suggest that the government's action is fairly attributable to the private defendant." *Id*. After all, it is "the state action, not the private conduct, which is unconstitutional"—and where true compulsion has occurred, a "private party in such a case is 'left with no choice of his own' and consequently should not be deemed liable." *Id.*

*Sutton* thus held that "governmental compulsion, without more," is not enough "to deem a truly private entity a governmental actor." *Id*. at 843. Here, however, Plaintiffs assert a naked compulsion theory against a private party. Those allegations—implausible as they are—lack the "'something more'" that *Sutton* requires. *Id*. at 838; *accord Doe*, 2021 U.S. Dist. LEXIS 201377, at *12. Indeed, if Plaintiffs' logic were sound, YouTube would be the *victim* of coercion, and it would be unfair to subject it to liability when (according to Plaintiffs) the government forced it to do what it did. In such cases, "only the state actor, and not the private party, should be held liable for the constitutional violation that resulted from the state compulsion." *Sutton*, 192 F.3d at 838.

At a minimum, this rules out the broad preliminary injunction that Mr. Trump demands. That injunction would force YouTube to reinstate Mr. Trump and provide him with uninterrupted access to its service, without regard to YouTube's editorial determinations. PI at 29-30. But if YouTube really had been coerced, the proper remedy would be merely to remove that coercion and free YouTube to exercise its discretion as it sees fit. In *Carlin*, for example, the Ninth Circuit held that—while there was state action when the prosecutor's threats forced a telephone utility to cut off plaintiff's service—it "does not follow" that the utility "may never thereafter decide independently to exclude Carlin's messages from its 976 network. It only follows that the *state* may never *induce* Mountain Bell to do so." 827 F.2d at 1296-97. The court thus *vacated* an order enjoining the utility "from disconnecting Carlin" (*id*. at 1293), explaining that, should "Mountain Bell not wish to extend its 976 service to Carlin, it is also free to do that." *Id*. at 1297. So too here, Plaintiff cannot use a coercion theory to override YouTube's right—which is itself protected by the First Amendment (*see infra* § IV.B) to exercise its own editorial judgments about who can use

1   its service and under what terms. *See Assocs. & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133,

2   135 (9th Cir. 1971) ("Even if state action were present … there is still the freedom to exercise

3   subjective editorial discretion in rejecting a proffered article.").

4       **C.**    **Plaintiffs Have Not Plausibly Alleged "Joint Action"**

5       Plaintiffs also assert a "joint action" theory based on YouTube's regulation of health

6   misinformation. AC ¶¶ 110-56. This theory is also contrary to settled law. *See CHD*, 2021 U.S.

7   Dist. LEXIS 121314, at *30-39; *Doe*, 2021 U.S. Dist. LEXIS 201377, at *12-17; *FAN*, 432 F.

8   Supp. 3d at 1124-27; *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *15-20 (each rejecting similar

9   joint action theories asserted against YouTube and/or Facebook).

10       Joint action exists only when "state officials and private parties have acted in concert in

11   effecting a particular deprivation of constitutional rights." *FAN*, 432 F. Supp. 3d at 1124. Under

12   this theory, a "private entity may be considered a state actor only if its particular actions are

13   inextricably intertwined with those of the government." *Pasadena Republican Club v. W. Justice*

14   *Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021). This requires "substantial coordination and significant

15   financial integration between the private party and government." *Id.* at 1168 (cleaned up)

16   (observing that the Ninth Circuit has repeatedly "declined to expand" this test). Joint action does

17   not exist where the governing "statutory and regulatory regime leaves the challenged decisions to

18   the judgment of [the private entities]." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 58 (1999).

19       Plaintiffs do not come close to meeting these strict standards. They do not allege that

20   YouTube intertwined itself with the government, much less in connection with the specific

21   moderation decisions at issue. As in *Doe*, which rejected a very similar joint action theory against

22   YouTube, "there is no allegation that government officials were in the room or somehow directly

23   involved in the decision to suspend Plaintiffs" or remove their content. 2021 U.S. Dist. LEXIS

24   201377, at *16; *accord FAN*, 432 F. Supp. 3d at 1126 ("there was no joint action because Plaintiffs

25   fail to allege specific facts establishing the existence of an agreement or a meeting of the minds

26   between Facebook and the government relating to Facebook's deletion of FAN's Facebook page").

27       Instead, Plaintiffs allege that YouTube's general misinformation policy was informed by

28   consultation with experts, including the CDC (AC ¶¶ 110-11), that government officials "engage"

or "communicate" with social media platforms about misinformation (AC ¶¶ 142-50, ¶¶ 115-56), and that members of Congress have "advocated restricting speech on the Internet related to the COVID-19 virus" (AC ¶¶ 151-54). This falls far short of the "substantial coordination and significant financial integration" required for joint action. "[G]eneral statements . . . about 'working together' to reduce the spread of health or vaccine misinformation . . . do not show that the government was a 'joint participant in the challenged activity.'" *CHD*, 2021 U.S. Dist. LEXIS 121314, at *31-32; *see id*. at *37. These allegations are virtually identical to those rejected in *Doe*: "federal lawmakers publicly flagged general categories of content for Defendants to consider moderating and issued threats to compel Defendants to comply, Defendants independently chose what content fit into the lawmakers' general categories, and Plaintiffs' channels happened to be some of the content Defendants decided to remove." 2021 U.S. Dist. LEXIS 201377, at *14-15. As Judge Freeman explained, "[c]ourts have dismissed cases for lack of state action despite significantly more alleged cooperation between public and private actors compared to what Plaintiffs allege here." *Id.* at *15.

Plaintiffs' theory that a private party becomes a state actor whenever it acts in a manner consistent with public-health recommendations or consults with federal officials about such matters would also have pernicious consequences. It could "effectively cause companies to cease communicating with their elected representatives for fear of liability." *Doe*, 2021 U.S. Dist. LEXIS 201377, at *14. And it could throw into question all manner of salutary private-sector efforts to follow federal health and policy guidelines. Fortunately, that is not the law: "regulatory interest in a problem" does not "transform[] any subsequent private efforts to address the problem (even those expressly designed to obviate the need for regulation) into state action." *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996).

### D.   Section 230 Does Not Make YouTube Into A State Actor

Finally, Plaintiffs argue that Section 230 provides such a "significant encouragement to censor" protected speech that YouTube's moderation choices should be deemed state action. AC ¶¶ 78-109; PI at 9-11. This argument too has repeatedly been rejected—including by the Ninth Circuit. *Atkinson*, 2021 U.S. App. LEXIS 34632 at *3 ("Section 230 of the Communications

1   Decency Act does not independently transform Meta Platforms into a government actor for First

2   Amendment purposes."); *accord Divino*, 2021 U.S. Dist. LEXIS 3245, at *16-22; *Newman*, 2021

3   U.S. Dist. LEXIS 119101, at *28-30; *CHD*, 2021 U.S. Dist. LEXIS 121314, at *39-43.

4        A claim of state action requires that "the party charged with the deprivation must be a

5   person who may fairly be said to be a state actor." *Roberts*, 877 F.3d at 838 (quoting *Lugar v.*

6   *Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). But YouTube is not transformed into a state actor

7   simply by relying on Section 230 as a litigation defense. Private parties do not "face constitutional

8   litigation whenever they seek to rely on some statute governing their interactions with the

9   community surrounding them." *Id*. at 845 (quoting *Lugar*, 457 U.S. at 937). The Ninth Circuit has

10  expressly held that private action undertaken pursuant to—or even to comply with—a statute is

11  not state action. *See id.* (invocation of federal statute to compel enforcement of arbitration

12  agreement); *Sutton*, 192 F.3d at 837-44 (private employer's decision not to hire plaintiff for

13  refusing to provide social security number that was required by federal law). This principle applies

14  even more clearly to an immunity provision like Section 230: it would make no sense to hold that

15  a statute *protecting* private parties from liability actually *subjects* them to constitutional tort claims.

16       Citing *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989), Plaintiffs

17  argue that Section 230 "encourages" YouTube to censor speech. PI at 10-11. But "*Skinner* is

18  inapposite." *Newman*, 2021 U.S. Dist. LEXIS 119101, at *28. It involved a comprehensive federal

19  drug testing regime for railroad employees, under which the government: (1) required the railroads

20  to fire any employee who declined testing; (2) had the right to receive employees' test results; and

21  (3) barred the railroads from divesting themselves of the authority created by the regulations.

22  *Skinner*, 489 U.S. at 611, 615. These mandates provided "clear indices of the Government's

23  encouragement, endorsement, *and* participation," rendering the railroads "instrument[s] or

24  agent[s] of the Government." *Id.* at 614-16 (emphasis added). *Newman*, *Divino*, and *CHD* all

25  expressly rejected efforts to equate *Skinner*'s coercive provisions with Section 230. *See, e.g.*, *CHD*,

26  2021 U.S. Dist. LEXIS 121314, at *43.

27       "Unlike the federal regulation at issue in *Skinner*, Section 230 does not compel Defendants

28  or any other private entity to take any action on behalf of the federal government." *Newman*, 2021

U.S. Dist. LEXIS 119101, at *29. Moreover, "the federal government does not encourage, endorse, and participate in the challenged editorial decisions of Defendants through Section 230" (*id.* at *30)—nor does Section 230 "give the government a right to supervise or obtain information about private activity" (*Divino*, 2021 U.S. Dist. LEXIS 3245, at *17). While the *Skinner* regulations expressed a "strong preference" for drug testing and made the government a partner in the testing process (489 U.S. at 615), "Section 230 is designed to keep the federal government *removed* from the editorial decision-making process of internet companies like YouTube and Google." *Newman*, 2021 U.S. Dist. LEXIS 119101, at *30 (emphasis added); *see* 47 U.S.C. §§ 230(a)(4), (b)(2). Section 230 leaves the full range of editorial choices to the discretion of online services: the statute protects decisions to remove content, *Fyk*, 2019 U.S. Dist. LEXIS 234960, at *6, just as it protects the "proliferation and dissemination" of content, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269, 1271 (9th Cir. 2016). It would turn Section 230—and the First Amendment—on its head to conclude that this *deregulatory* statute somehow transformed private decisions into government conduct.

 *Hanson* is equally far afield. That case did not involve a First Amendment claim against a private party or an immunity protecting such parties. The plaintiffs invoked a state law to enjoin enforcement of a labor agreement that required them to join a union. The agreement was enforceable only because of an amendment to the Railway Labor Act. *Ry. Emps.' Dep't v. Hanson*, 351 U.S. 225, 227-32 (1956). In considering a First Amendment challenge to the enactment of that amendment, *Hanson* did not hold that otherwise private parties were state actors—it simply found that the labor agreement had "the imprimatur of the federal law upon it." *Id.* at 232. *Hanson*'s state action holding has never been expanded beyond federal labor law—and certainly has never been read to suggest that private parties become state actors by relying on a federal statute that preempts contrary state law.[4] Any such reading would be directly contrary to the Ninth Circuit's decision in *Roberts*, which held that AT&T was not a state actor when it relied on the Federal Arbitration Act

---

[4] The Supreme Court has made clear that *Hanson*—if even still good law—is on shaky footing and should not be extended. *See Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2479 n.24 (2018) (*Hanson*'s conclusion that "Congress's enactment of a provision allowing, but not requiring, private parties to enter into union-shop arrangements was sufficient to establish governmental action" was "debatable when *Abood* was decided, and is even more questionable today").

("FAA") to preempt state law that would have precluded enforcement of its arbitration agreement. 877 F.3d at 836, 844-45. *Roberts* confirms that laws that give federal protection and "approval of private action"—and have nothing "even resembling the sort of coercive regulations" at issue in *Skinner*—do not create state action. *Id*. at 844-45. Here, even Plaintiffs admit that "Congress permitted *but did not mandate* censorship action by social media platforms." AC ¶ 107 (emphasis added). And "permission of private choice cannot support a finding of state action." *Id*. at 845; *accord Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 52 ("Action taken by private entities with the mere approval or acquiescence of the State is not state action.").

## II.      PLAINTIFFS' CONSTITUTIONAL CHALLENGE TO SECTION 230 FAILS

Plaintiffs' bid for a declaratory judgment invalidating Section 230 as a violation of the First Amendment fares no better. Courts—including the Ninth Circuit—have repeatedly rejected efforts to obtain identical rulings. *Lewis*, 851 F. App'x at 723-24; *Divino*, 2021 U.S. Dist. LEXIS 3245, at *31-33; *Newman*, 2021 U.S. Dist. LEXIS 119101, at *42. This Court should do likewise.

*First*, Plaintiffs lack standing to raise a constitutional challenge to Section 230, as they cannot plausibly allege that their injuries are "fairly traceable" to Section 230 or that they would be "redressed by a favorable decision" invalidating Section 230. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). This case is identical to *Lewis*, in which the Ninth Circuit held that the plaintiff lacked standing to bring a constitutional challenge to Section 230 after YouTube removed his videos. As the Court explained, "[n]one of the alleged injuries in Lewis' challenge to the CDA's constitutionality are fairly traceable to the application of § 230." *Lewis*, 851 F. App'x at 723. "Section 230 does not apply to Lewis's conduct or provide a mechanism for sanctions that could affect Lewis." *Id*. at 724. So too here, Plaintiffs' alleged injuries "arose from the actions of YouTube, a private entity, as it enforced its own standards" and were not caused by Section 230. *Id*. at 723. A declaratory judgment would not reinstate Plaintiffs' content—or otherwise redress their purported injuries. *See Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100, 106 (D.D.C. 2016) ("even absent the affirmative defense supplied by § 230, the private social-media companies could argue that they cannot be compelled to publish a particular message").

*Second*, application of Declaratory Judgment Act is always discretionary, *see Wilton v.*

1  *Seven Falls Co.*, 515 U.S. 277, 286-87 (1995), and using the Act "'to anticipate an affirmative

2  defense is not ordinarily proper.'" *Divino*, 2021 U.S. Dist. LEXIS 3245, at *32 (cleaned up). That

3  is particularly so here, as YouTube's motion can (and should) be granted even apart from any

4  Section 230 defense. *See id.* at *32-33; *Newman*, 2021 U.S. Dist. LEXIS 119101, at *42.

5       *Third*, Plaintiffs' claim faces the same state action problem discussed above. Plaintiffs have

6  not sued the government; they sued a private company. But for a constitutional challenge to lie,

7  "the party charged with the deprivation" must be state actor." *Roberts*, 877 F.3d at 838. And

8  binding precedent precludes Plaintiffs from evading that rule by framing their constitutional claim

9  as a "direct" challenge to a federal statute. *Id.* at 838-39. As in *Roberts*, the fact that YouTube can

10 invoke Section 230 in defending against Plaintiffs' claims does not mean that Plaintiffs can assert

11 a First Amendment challenge without establishing that YouTube is a state actor. *Id.*

12      *Finally*, Plaintiffs' claim fails on the merits. Their theory that Section 230 is

13 unconstitutional is contrary to decades of unbroken precedent. *See, e.g.*, *Green v. AOL*, 318 F.3d

14 465, 472 (3d Cir. 2003); *Winter v. Facebook, Inc.*, 2021 U.S. Dist. LEXIS 224836, at *12-13 (E.D.

15 Miss. Nov. 22, 2021); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 994-95 (S.D. Tex. 2017);

16 *Parker v. PayPal, Inc.*, 2017 U.S. Dist. LEXIS 130800, at *16-17 (E.D. Pa. Aug. 16, 2017) (all

17 rejecting constitutional challenges). "Section 230 does not prohibit any speech." *Lewis*, 851 F.

18 App'x at 724 n.2; *accord* AC ¶ 107. It simply allows private online services "to establish standards

19 of decency without risking liability for doing so." *Green*, 318 F.3d at 472. In this way, "Section

20 230 reflects a deliberate *absence* of government involvement in regulating online speech," *Divino*,

21 2021 U.S. Dist. LEXIS 3245, at *17. That does not remotely violate the First Amendment.

22 **III.   PLAINTIFFS HAVE NO VIABLE CLAIM UNDER FDUTPA (COUNT THREE)**

23      Plaintiffs' Amended Complaint also asserts two claims under Florida law. The first invokes

24 Florida's general consumer protection law, FDUTPA. This claim is foreclosed by the governing

25 choice-of-law provision and otherwise fails for multiple reasons.

26      **A.    The Choice-of-Law Provision Bars Plaintiffs' General FDUTPA Claim**

27      As a threshold matter, Plaintiffs' FDUTPA claim is barred by the choice-of-law provision

28 YouTube's TOS. The parties agreed that "all claims arising out of or relating to these terms or the

Service" "will be governed by California law, except California's conflict of laws rules." Veitch Decl. ¶ 7, Ex. A. Disregarding that agreement, Plaintiffs sued in Florida and invoked Florida law. Judge Moore applied the forum-selection clause in the same provision to transfer this case to this Court. Transfer Order at 5. That ruling establishes, as law of the case, that the TOS is binding on Plaintiffs, that the claims here arise out of and relate to the TOS and the YouTube service, and that applying the TOS to FDUTPA claims "does not contravene public policy." *Id*. at 5, 12, 15, 19.

Under California law, a choice-of-law provision is enforceable so long as "the chosen state has a substantial relationship to the parties or their transaction" and "there is any other reasonable basis for the parties' choice of law.'" *Palomino v. Facebook, Inc.*, 2017 WL 76901, at *3 (N.D. Cal. Jan. 9, 2017). The "substantial relationship" prong is easily met here: "Defendant is headquartered in California and maintains its principal place of business in California." *Id*. Once the first prong is met, "the burden shifts to Plaintiffs to show that the application of California law would violate fundamental [Florida] policy." *Id.* Plaintiffs cannot do so here.

Like Florida, California "has its own robust body of consumer protection law that strives to prevent consumer deception." *Id*. at *4 (dismissing claim under New Jersey consumer protection law where agreement required California law); *accord Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1056 (N.D. Cal. 2018) (same, as to New York consumer protection claim); *cf. Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158, 1166 (N.D. Cal. 2008) (applying choice-of-law provision to bar California consumer protection claims). It is well settled, moreover, that "[d]ifferences in the particulars of the consumer statutes are not enough" to avoid a choice-of-law provision, "because the inquiry must focus on the fundamental policies." *Williams*, 384 F. Supp. 2d at 1056. Courts routinely dismiss claims under FDUTPA where the parties' agreement required claims to be brought under the law of a state with similar provisions. *Herssein Law Grp. v. Reed Elsevier, Inc.*, 2014 U.S. Dist. LEXIS 185972, at *24 (S.D. Fla. Mar. 5, 2014) ("a choice-of-law provision that provides for the application of non-Florida law precludes a claim under the FDUTPA"); *Sherman v. PremierGarage Sys., LLC*, 2010 U.S. Dist. LEXIS 77392, at *21 (D. Ariz. July 30, 2010) ("[T]he Court deems it appropriate and just to enforce the choice-of-law provision—agreed to by both parties—to preclude the Shermans' FDUTPA claim."). The same result is required here.

**B.      Plaintiffs' Claim That YouTube Acted Deceptively By Applying Its Moderation Rules Inconsistently Fails as a Matter of Law**

Even if Plaintiffs could proceed with a FDUTPA claim, it would fail. Plaintiffs appear to be alleging deception based on the theory that YouTube "policies ostensibly proclaim objective, uniform standards by which content may be censored," while in practice YouTube allegedly does not act "equally" or "fairly" in enforcing its content-moderation policies—it "engage[s] in a subjective pattern of discriminating against disfavored parties." AC ¶¶ 269-81. This claim does not work, and the only relief Plaintiffs seek under the general provisions of FDUTPA—an injunction requiring YouTube to publish their speech and installing a monitor to second-guess its editorial determinations (AC ¶ 282)—is patently unconstitutional.

*First*, Plaintiffs fail to meet the heightened pleading standard of Fed. R. Civ. P. 9(b). They allege that YouTube's enforcement of its policies is "deceptive and misleading." AC ¶¶ 269, 274. "[C]ourts regularly apply Rule 9(b) to FDUTPA claims," where, as here, those claims sound in fraud or deception. *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, 2016 U.S. Dist. LEXIS 195735, at *10 (S.D. Fla. Feb. 16, 2016); *accord Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (applying Rule 9(b) to FDUTPA claim alleging that defendant "caused damages through deception"); *Hauck v. Advanced Micro Devices, Inc.*, 2019 WL 1493356, at *11 (N.D. Cal. Apr. 4, 2019) (same, based on Ninth Circuit law). Here, however, Plaintiffs identify no actual statements that they claim are deceptive, much less the requisite "who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the] statement, and why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011). Vague allegations about "Defendants' policies" (AC ¶ 271) are not sufficient.

*Second*, even apart from Rule 9(b), Plaintiffs have no viable claim because a reasonable consumer would not be deceived by YouTube's public statements into believing that YouTube was assuring "objective" or "uniform" application of its moderation policies. AC ¶ 271. The Amended Complaint certainly does not identify anything that amounts to such a representation. Indeed, the allegations under Count Three do not identify a single actual YouTube policy or statement, much less one that invoked objectivity or uniformity. AC ¶¶ 268-82. The Community

Guidelines provisions referenced elsewhere do not speak in those terms. AC ¶¶ 37-41, 292-93. And the only other policy statement referenced in the complaint is YouTube's general mission statement: to "give everyone a voice and show them the world." AC ¶ 36. As a matter of law, statements like these are not capable of deceiving a reasonable consumer. The Ninth Circuit held as much in *Prager*, explaining that this very statement—and similarly "[l]ofty but vague statements" about YouTube's "commitment to free speech"—are "classic, non-actionable opinions or puffery" as they are "impervious to being quantifiable." 951 F.3d at 1000. Such "vague and highly subjective statements" cannot support a deception claim under FDUTPA either. *Hertz Corp. v. Accenture, LLP*, 2019 U.S. Dist. LEXIS 185373, at *12-13 (S.D.N.Y Oct. 25, 2019) (dismissing FDUTPA claim based on defendant's claim to have "the best talent in the world"); *accord Thompson v. P&G*, 2018 U.S. Dist. LEXIS 179888, at *6 (S.D. Fla. Oct. 19, 2018) (dismissing FDUTPA claim based on a representation that is "not the sort of empirically verifiable statement that [could] be affirmatively disproven"); *Perret v. Wyndham Vacation Resorts, Inc.*, 889 F. Supp. 2d 1333, 1341 (S.D. Fla. 2012) (same, based on statements that purchase price was "reasonable"). This would be like suing the New York Times for not actually publishing "All The News That's Fit to Print" or Fox News for not being "Fair and Balanced."

But even apart from puffery, no reasonable user could believe that YouTube's policies assured "objective, uniform" moderation standards. AC ¶ 271. Plaintiffs themselves allege that YouTube's Community Guidelines are "vague, broad, ill-defined, or not defined at all." AC ¶ 38; *id.* ¶ 7 ("non-existent or broad, vague, and ever-shifting standards"). Having made that allegation, Plaintiffs cannot plausibly claim to have been deceived into thinking that those same policies were "objective" and "uniform." That is especially so because YouTube's own policy statements make clear that it retains the right to make exceptions to the Guidelines[5] and, more generally, that YouTube has broad discretion to make its own moderation determinations even apart from the specifics of what the Guidelines prohibit. YouTube's governing TOS expressly states: "If we

---

[5] For example, YouTube's publicly stated policies for educational, documentary, scientific, and artistic content ("EDSA") explain that "sometimes *videos that might otherwise violate our policies may be allowed to stay on YouTube* if the content offers a compelling reason with visible context for viewers." Veith Decl. ¶ 21 (emphasis added).

reasonably believe that any Content is in breach of this Agreement or may cause harm to YouTube, our users, or third parties, we may remove or take down that Content *in our discretion*." Veitch Decl. Ex. (TOS) (emphasis added). The TOS affords YouTube similarly broad discretion over suspensions, which may occur, *inter alia*, when "*we believe* there has been conduct that creates (or could create) liability or harm to any user, other third party, YouTube or our Affiliates." *Id.* (emphasis added). In short, the governing contract makes clear that YouTube's beliefs and discretionary judgments play a role in how its policies are applied.

That reality defeats Plaintiffs' claim. A "FDUTPA claim will not lie" where the allegedly deceptive practices are specifically permitted by the parties' agreement. *Great White N. Franchisee Ass'n-USA, Inc. v. Tim Hortons USA, Inc.*, 2020 WL 8024349, at *8-10 (S.D. Fla. Dec. 18, 2020). "[A] plaintiff has no FDUTPA claim where he signed a contract whose terms expressly contradict any misrepresentation on which he relied." *Zlotnick v. Premier Sales Grp., Inc.*, 431 F. Supp. 2d 1290, 1295 (S.D. Fla. 2006), *aff'd*, 480 F.3d 1281 (11th Cir. 2007). Courts routinely dismiss FDUTPA claims based on this rule. *E.g.*, *Kennedy v. Deschenes*, 2017 WL 2223050, at *5 (S.D. Fla. May 19, 2017); *Sol. Z v. Alma Lasers, Inc.*, 2013 WL 12246356, at *12 (S.D. Fla. Jan. 22, 2013). And here, the very things Plaintiffs say are deceptive—that YouTube's content-moderation judgements are supposedly subjective and discretionary—are disclosed in the governing agreement and related policy documents.

*Third,* Plaintiffs cannot establish a causal link between YouTube's alleged deceptions and their purported injuries. "[C]ausation is a necessary element of the FDUTPA claim," and it "'must be direct, rather than remote or speculative.'" *Lombardo v. Johnson & Johnson Consumer Cos.*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015); *accord* Fla. Stat. Ann. § 501.211(1). But Plaintiffs' allegations related to their own injuries are sorely lacking. Plaintiffs do not claim that YouTube was not entitled to remove *their* content under its Community Guidelines. AC ¶¶ 164-234. Instead, the nub of their claim is that YouTube failed to remove *other* videos that, in Plaintiffs' view, were similar to theirs. AC ¶¶ 92-95. This makes it questionable whether Plaintiffs are aggrieved at all: it is not clear why, if YouTube had removed videos relating to Maxine Waters or Kathy Griffin (as Plaintiffs say it should have, AC ¶¶ 275-76), Plaintiffs would have been better off.

But even setting that aside, Plaintiffs allege no meaningful link between whatever personal injury they posit and YouTube's supposedly deceptive statements. Plaintiffs claim to be "aggrieved by the Defendants' failure to act in good faith and apply their stated policies to the Plaintiffs' content." AC ¶ 281. Such harm flows, if at all, from YouTube's *moderation decisions themselves*—not from the statements YouTube made about its policies. This is not a case where Plaintiffs were deceived by some statement into buying a product or using a service they otherwise would not have bought or used. YouTube's statements by themselves had no alleged effect on Plaintiffs. They would have suffered the same purported harm no matter what YouTube said about its policies. *Newman* is instructive. The plaintiffs there alleged that YouTube's statements about its content-moderation decisions were false advertising. The court dismissed that claim for lack of causation, as plaintiffs' alleged injuries did not "flow[] from Defendants' allegedly false statements"—they "flow[ed] from the fact that Defendants have limited access to Plaintiffs' videos." 2021 U.S. Dist. LEXIS 119101, at *37-38. Because it was "the unavailability of the video itself that harms Plaintiffs," they "failed to allege that they have been or are likely to be injured as a result of Defendants' allegedly false statements." *Id.* at *38 (cleaned up). The same is true here.

In sum, YouTube's policies are not misleading merely because Plaintiffs disagree about how they were applied or because they think YouTube's moderation choices were in some cases inconsistent. Nothing in FDUTPA allows Plaintiffs to invoke the rhetoric of consumer deception to replace YouTube's discretionary judgments with their views about how YouTube should enforce its own policies. Plaintiffs' unprecedented effort to use FDUTPA to second-guess YouTube's editorial choices—and to obtain an injunction compelling YouTube to host their content (AC ¶ 282)—not only fails under Florida law, but is also categorically barred by the First Amendment (and Section 230). *See infra* §§ IV.B & VII. Indeed, the fact that the only relief Plaintiffs seek on their FDUTPA claim is unconstitutional is reason alone to reject it.

## IV.   PLAINTIFFS' CLAIM UNDER FLORIDA'S SSMCA FAILS (COUNT FOUR)

Finally, Plaintiffs invoke Florida's new "Stop Social Media Censorship Act" (SSMCA), Fla. Stat. 501.2041—a first-of-its-kind law that seeks to strip online services of their right to exercise editorial discretion over content on their platforms. Finding that the statute violated the

First Amendment and was preempted by Section 230, the Northern District of Florida preliminarily enjoined state enforcement of the SSMCA shortly before it was scheduled to take effect. *NetChoice, LLC v. Moody*, 2021 WL 2690876 (N.D. Fla. June 30, 2021), *appeal docketed*, No. 21-12355 (11th Cir. July 13, 2021). Nevertheless, Plaintiffs invoke the SSMCA's private right of action, which purports to require "social media platforms" to apply their content-moderation standards "in a consistent manner among its users." Sec. 501.2041(b). These claims face two threshold problems; apart from those, the statute is unconstitutional—on its face and as applied.

### A.    The SSMCA Does Not Apply To Non-Floridians Or Retroactively

*First*, the SSMCA affords a right of action only to a "user," Sec. 501.2041(6), defined as "a person who resides or is domiciled in this state and who has an account on a social media platform." Sec. 501.2041(1)(h). At least three of the named Plaintiffs do not live in Florida, and thus cannot sue under this law. AC ¶ 189 (Plaintiff Naomi Wolf), ¶ 202 (Plaintiff Colleen Victory), ¶ 217 (Plaintiff ACU). Their claims must be dismissed for that reason alone.

*Second*, the SSMCA's effective date was July 1, 2021. AC ¶ 288; Sec. 501.2041(7). Plaintiffs purport to limit their claim to "fail[ure] to apply . . . standards in a consistent manner" "since July 1, 2021." AC ¶ 291. That limitation is necessary because the statute does not apply retroactively. Florida law is clear that "an enactment that affects substantive rights or creates new obligations or liabilities is presumed to apply prospectively." *Hassen v. State Farm Mut. Auto. Ins. Co.*, 674 So. 2d 106, 108 (Fla. 1996). The SSMCA is unquestionably such a statute, and the legislature "clearly expressed its intent regarding the effective date of the act" by providing such a date. *Id.* Here, however, none of the Plaintiffs (save one) alleges any relevant actions by YouTube that occurred after the statute's effective date. Four Plaintiffs (including Mr. Trump) challenge decisions that *preceded* that date. AC ¶¶ 164-68 (Trump); ¶ 180 (Baggiani); ¶¶ 196-99 (Valentine); ¶ 208 (Victory). Three others fail to allege any relevant post-July 1, 2021 activity. AC ¶¶ 181-88 (Jean-Louis); ¶¶ 189-92 (Wolf); ¶¶ 211-16 (Fletcher). Those Plaintiffs' claims all must be dismissed. *E.g.*, *Wiggins v. Hartford Ins. Co. of the Midwest*, 2007 WL 9702712, at *8 (S.D. Fla. Oct. 22, 2007). The only Plaintiff to allege relevant conduct after the effective date is ACU, a non-Florida resident that has no right to sue under the SSMCA in the first place. AC ¶ 217. As such,

1    even apart from the merits, none of the Plaintiffs can invoke the SSMCA.

2    **B.    The SSMCA Is Unconstitutional On Its Face**

3    Even if Plaintiffs could proceed under the SSMCA, their claims would fail. To begin with,

4    as the Northern District of Florida has already found, the SSMCA on its face—including the

5    consistency provision—violates the First Amendment. *Moody*, 2021 WL 2690876 at *11.

6    The right to make editorial judgments is a fundamental component of the "freedom of

7    speech" protected by the First Amendment. The government cannot compel "editors or publishers

8    to publish that which reason tells them should not be published." *Miami Herald Publ'g Co. v.*

9    *Tornillo*, 418 U.S. 241, 256, 258 (1974) (applying right to "exercise of editorial control and

10    judgment" to strike down law requiring newspapers to publish material); *accord Denver Area*

11    *Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737 (1996) (plurality) ("the editorial

12    function itself is an aspect of 'speech.'"); *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*

13    *of Boston, Inc.*, 515 U.S. 557, 570 (1995) ("the presentation of an edited compilation of speech

14    generated by other persons … fall[s] squarely within the core of First Amendment security");

15    *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) ("by exercising editorial discretion over

16    which stations or programs to include in its repertoire, cable programmers and operators seek to

17    communicate messages on a wide variety of topics and in a wide variety of formats"). That is why,

18    as the Ninth Circuit has explained, "[t]here is no difference between compelling publication of

19    material that the newspaper wishes not to print and prohibiting a newspaper from printing news or

20    other material." *Assocs. & Aldrich*, 440 F.2d at 135.

21    That rule is not "restricted to the press"—it is "enjoyed by business corporations generally

22    and by ordinary people engaged in unsophisticated expression as well as by professional

23    publishers." *Hurley*, 515 U.S. at 574; *accord Halleck*, 139 S. Ct. at 1930 ("when a private entity

24    provides a forum for speech," it may "exercise editorial discretion over the speech and speakers in

25    the forum"). Indeed, it is well established that "[s]ocial media platforms have a First Amendment

26    right to moderate content disseminated on their platforms." *NetChoice v. Paxton*, No. 21-cv-

27    00840-RP, slip op. at 12 (W.D. Tex. Dec. 1, 2021) (enjoining enforcement of Texas law similar to

28    SSMCA); *accord La'Tiejira*, 272 F. Supp. 3d at 991-92 ("online publishers have a First

1    Amendment right to distribute others' speech and exercise editorial control on their platforms");

2    *Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 629 (E.D. Va. 2019) ("Facebook has, as a private

3    entity, the right to regulate the content of its platforms as it sees fit."); *Zhang v. Baidu.com Inc.*,

4    10 F. Supp. 3d 433, 440 (S.D.N.Y. 2014) (First Amendment barred claims seeking to compel

5    search engine to include results on certain political subjects).

6         As the *Moody* court explained, the SSMCA directly undermines these core First

7    Amendment protections. The legislation is "about as content-based as it gets": it both "compels

8    providers to host speech that violates their standards—speech they otherwise would not host—and

9    forbids providers from speaking as they otherwise would." 2021 WL 2690876, at *1, *10. As most

10   relevant here, the SSMCA's slew of "content-based," "speaker-based," and "viewpoint-based"

11   restrictions on protected editorial judgments (including through the consistency provision) are not

12   narrowly tailored to any compelling government interest; indeed, these provisions come "nowhere

13   close" to satisfying strict scrutiny (or even intermediate scrutiny). *Id*. at *9-11. As *Moody* aptly

14   put it, the statute is an "instance of burning the house to roast a pig." *Id*. at *11.

15        The court further held that the SSMCA's restrictions were motivated by a "hostility to the

16   social media platforms' perceived liberal viewpoint." *Id.* at *10. That hostility was apparent from

17   the statute's arbitrary focus on the largest "social media platforms," which amounted to an

18   improper speaker-based distinction and from the fact that Florida carved out owners and operators

19   of theme parks because it was "apparently unwilling to subject favored Florida businesses to the

20   statutes' onerous regulatory burdens." *Id.* In short, "these statutes violate the First Amendment.

21   There is nothing that could be severed and survive." *Id*. at *11. This Court should likewise decline

22   to give effect to this blatantly unconstitutional law.

23   **C.    The SSCMA Is Unconstitutional As Applied To This Case**

24        Beyond the SSMCA's facial invalidity, the Act is unconstitutional as applied to this case.

25   Plaintiffs' claims stem from the provision that requires "social media platforms" to "apply

26   censorship, deplatforming, and shadow banning standards in a consistent manner among its users

27   on the platform." Sec. 501.2041(2)(b). Plaintiffs say that YouTube violated this provision because

28   of supposedly "inconsistent application" of its content-moderation standards. AC ¶¶ 286-300; PI

at 20-27. On that basis, Plaintiffs seek statutory and punitive damages—as well as sweeping injunctive relief that would force YouTube to reinstate the content that it had moderated, "honor [its] own policies," and "impose a monitor to ensure [YouTube's] compliance" with the Act's consistency requirement. AC ¶ 301. This proposed application of Florida's law violates the First Amendment, due process, and the Commerce Clause.

*First Amendment.* Plaintiffs' allegations illustrate how Florida's requirement to moderate "in a consistent manner" is a blatant violation of YouTube's right to exercise editorial control and judgment. Plaintiffs assert that YouTube took down their videos while continuing to publish other videos that, by their lights, have similar content. They point, by way of example, to videos, including one posted by CNN in which President Biden spoke about COVID vaccinations, which they think violate YouTube's policies. AC ¶¶ 293-98; *accord* AC ¶¶ 92-95 (other examples). If YouTube was really being consistent with its policies, Plaintiffs say, it would have removed all of those videos too, and its decision not to do so violates Florida law. AC ¶¶ 286-87, 295-96, 298.

This claim is breathtaking: Plaintiffs are seeking hundreds of thousands of dollars in damages and broad injunctive relief because YouTube decided, in the exercise of its editorial discretion, *not* to remove videos posted by CNN, as well as public statements by Vice President Harris, Maxine Waters, Andrew Cuomo, and others. Plaintiffs ask this Court to second-guess YouTube's application of its own content-moderation standards and to override the discretionary judgments that YouTube made in applying those policies. Plaintiffs assert, in other words, that YouTube should be held liable under Florida law because it made editorial choices that they do not like. This is a clear-cut violation of the First Amendment. *See Tornillo*, 418 U.S. at 257-58 (Florida law enforcing right of access "exacts a penalty on the basis of the content of a newspaper" and "fails to clear the barriers of the First Amendment because of its intrusion into the function of editors"); *Hurley*, 515 U.S. at 575 (First Amendment protects "the choice of a speaker not to propound a particular point of view"); *Zhang*, 10 F. Supp. 3d at 443 ("Plaintiffs' efforts to hold Baidu accountable in a court of law for its editorial judgments about what political ideas to promote cannot be squared with the First Amendment.").

Indeed, as this case shows, Florida's requirement that online services moderate content in

a "consistent manner" is an unabashedly content-based restriction of YouTube's editorial speech. There is no way to determine whether moderation has been consistent without evaluating the content at issue. AC ¶¶ 293-96; *accord Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (law is content-based if it "cannot be justified without reference to the content of the regulated speech"). Such "'[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'" *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019) (quoting *Reed*, 576 U.S. at 163); *accord Turner*, 512 U.S. at 642 (laws that "compel speakers" to "distribute speech bearing a particular message are subject to the same rigorous scrutiny").

Here, however, there is no compelling—or indeed legitimate—state interest that justifies this invasion of YouTube's First Amendment rights. To the contrary, the very notion of compelling private parties to make more "consistent" or "fair" editorial choices "grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression." *Hurley*, 515 U.S. at 579. Policing the supposed consistency of private editorial choices or other protected speech is not a valid state purpose. As the Supreme Court has made clear, "it is not the role of courts to reject a [speaker's] expressed values because they disagree with those values or find them internally inconsistent." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 651 (2000); *accord Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 124 (1981) ("as is true of all expressions of First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational"). That is especially true in this context. The purpose of protecting editorial judgments is to allow private entities to make those choices for themselves—without government intrusion. *See Turner*, 512 U.S. at 641; *accord Halleck*, 139 S. Ct. at 1931. That includes the right to make difficult or subjective decisions in ways that might seem inconsistent or "unfair" to others. *Tornillo*, 418 U.S. at 258 (editorial "responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated"). Simply put, the law "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either

1  purpose may strike the government." *Hurley*, 515 U.S. at 579.

2      ***Vagueness.*** The SSMCA's direct interference with YouTube's First Amendment rights is

3  exacerbated by the Act's unconstitutional vagueness. Indeed, in a statute "riddled with imprecision

4  and ambiguity," *Moody* called out this provision as "especially vague." 2021 WL 2690876, at *11.

5  Rightly so, as it "fails to provide a person of ordinary intelligence fair notice of what is prohibited"

6  and "is so standardless that it authorizes or encourages seriously discriminatory enforcement."

7  *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012) (cleaned up) ("rigorous adherence" to the

8  rule against vagueness "is necessary to ensure that ambiguity does not chill protected speech").

9      Plaintiffs' claims prove the point. They say that it was inconsistent for YouTube to remove

10  certain statements by Mr. Trump about the January 6, 2021, attacks on the U.S. Capitol while

11  allowing comments by Maxine Waters about "tak[ing] Trump out" and "get[ting] confrontational."

12  AC ¶¶ 165, 275. They also complain that their comments related to COVID-19 prompted

13  moderation, while YouTube left up a video of a CNN Town Hall of President Biden stating:

14  "you're not going to get COVID if you have these vaccines." AC ¶¶ 294-96; *accord* AC ¶ 298; PI

15  at 22. In short, according to Plaintiffs, the presence of any content on YouTube that, in their view,

16  also violates the policies under which YouTube removed their content violates the consistency

17  provision. And they ask the Court to award them statutory and even punitive damages (and other

18  relief) based on this supposed inconsistency. AC ¶ 301.

19      This is the epitome of an unacceptably vague speech regulation. The SSMCA imposes a

20  sweeping mandate that private parties' editorial standards must be applied "in a consistent manner

21  among its users"—without defining what this is supposed to mean or how anyone is supposed to

22  make that determination. In Plaintiffs' hands, applying this provision calls for a subjective

23  comparison of their content against an arbitrarily selected set of other posts—putting courts in the

24  hopeless position of having to determine, without legislative guidance, whether YouTube's

25  inherently discretionary editorial judgments were "consistent." This invites only discriminatory

26  enforcement and endless legal risk. YouTube cannot predict what third parties might find to be

27  "inconsistent" applications of its policies. It has neither fair notice of what is prohibited nor any

28  reasonable way to avoid being charged with violating Florida law—short of removing essentially

1    all content or suspending its content-moderation efforts altogether. "Because First Amendment

2    freedoms need breathing space to survive, government may regulate in the area only with narrow

3    specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963). Florida did the opposite: enacting a

4    standardless dictate that allows government officials and private litigants to foist their views of

5    "consistency" on YouTube and to use the specter of draconian penalties to effectively veto, or at

6    least substantially chill, its protected editorial speech.

7         **Commerce Clause.** Finally, Florida's law violates the Commerce Clause. "[A] state law

8    that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders

9    is invalid under the Commerce Clause." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 332 (1989). The

10   Ninth Circuit has repeatedly applied this rule to bar states from trying to "reach beyond [their]

11   borders … and control transactions that occur wholly outside of the State." *Daniels Sharpsmart,*

12   *Inc. v. Smith*, 889 F.3d 608, 615-16 (9th Cir. 2018) (invalidating a law that regulated disposal at

13   facilities outside of California of waste originating in California).

14        The SSMCA is just such a law. As Plaintiffs seek to apply the statute, it would require

15   YouTube (a California-based company) to apply Florida's standards for moderation in a

16   "consistent manner" (among other requirements) on a nationwide basis. The only required

17   connection to Florida is that the "user" must be a Florida resident or domiciliary. Under Ninth

18   Circuit precedent, that is not enough. In *Sam Francis Foundation v. Christies, Inc.*, 784 F.3d 1320,

19   1323-25 (9th Cir. 2015) (en banc), the court struck down a California statute that required

20   purchasers of fine art to pay royalties to artists. The Ninth Circuit "easily conclude[d] that the

21   royalty requirement, as applied to out-of-state sales by California residents, violates the dormant

22   Commerce Clause." *Id.* at 1323. "Those sales have no necessary connection with the state other

23   than the residency of the seller." *Id*. And because "the state statute facially regulates a commercial

24   transaction that takes place wholly outside of the State's borders," it "violates the dormant

25   Commerce Clause." *Id*. (cleaned up).

26        The SSMCA fails for the same reason. It regulates online content moderation occurring

27   entirely outside of Florida, simply because the user bringing the claim resides in Florida. Countless

28   applications of this law will have no meaningful connection to Florida and involve "an

impermissible regulation of wholly out-of-state conduct." *Id*. at 1324. Mr. Trump's claim exemplifies the problem. He alleges that his YouTube account was suspended for posting content about the January 6, 2021 attack on the Capitol and for repeating false information about the Presidential election. AC ¶¶ 164-68. Neither that content nor YouTube's moderation of it has any connection with Florida—other than the happenstance that Mr. Trump maintains a residence there, which *Sam Francis* confirms is not enough. Such extraterritorial regulation "represents an attempt to regulate interstate conduct occurring outside [Florida's] borders, and is accordingly a per se violation of the Commerce Clause." *ACLU v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999) (invalidating a state law restricting online content extraterritorially).

## V.    SECTION 230 BARS PLAINTIFFS' STATE LAW CLAIMS SEEKING TO HOLD YOUTUBE LIABLE FOR ITS CONTENT-MODERATION CHOICES

Beyond all the other problems with Plaintiffs' FDUTPA and SSMCA claims, they are also barred by Section 230. While the Court need not address this issue as these claims fail for numerous other reasons, Plaintiffs' effort to hold YouTube liable under Florida law for the choices it made about what content to publish (or not publish) on its service is exactly what Section 230 forbids.

Under Section 230, "[n]o provider or user of an interactive service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). This provision "establish[es] broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.' Immunity extends to activities of a service provider that involve its moderation of third-party content, such as 'reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content.'" *Fyk*, 2019 U.S. Dist. LEXIS 234960, at *2-3 (quoting *Perfect 10, Inc. v. CCBill LLC*, 481 F.3d 751, 767 (9th Cir. 2007)). There is a three-part test for immunity, which applies "'at the first logical point in the litigation process.'" *Id*. at *3.

*First*, YouTube is the provider of an "interactive computer service" (47 U.S.C. § 230(f)(2)). AC ¶ 32 ("YouTube allows Users to create channels and upload content."); *accord Gonzalez v. Google LLC*, 2 F.4th 871, 891 (9th Cir. 2021); *Daniels*, 2021 WL 1222166, at *12.

*Second*, Plaintiffs' claims arise from content created by "individuals or entities other than"

YouTube—Plaintiffs and various third parties (AC ¶¶ 48-62, 92-106, 173-234). *Fyk*, 2019 U.S. Dist. LEXIS 234960, at *4-5 (rejecting argument that "Facebook is not entitled to immunity because although the statute provides immunity for a website operator for the removal of third-party material, here there is no third party as Plaintiff himself contends that he created the content on his pages"); *Fyk*, 808 F. App'x at 598 (affirming that "the fact that [plaintiff] generated the content at issue does not make § 230(c)(1) inapplicable").

*Third*, Plaintiffs' claims seek to hold YouTube liable as the "publisher or speaker" of third-party content. They allege that YouTube's decisions about what content to remove—and what to keep publishing—violate Florida law. AC ¶¶ 270-71, 287, 294-98. This is core publisher activity protected by Section 230. "Publication 'involves the reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content.' Thus, 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.'" *Fyk*, 2019 U.S. Dist. LEXIS 234960, at *6 (§ 230(c)(1) barred claims arising from "allegations that Facebook removed or moderated" content).

*Fyk* follows a long line of cases, in this Court and elsewhere, that apply Section 230(c)(1) to reject claims seeking to hold online services liable for their decisions about whether to publish and how to moderate user-submitted content. *See, e.g.*, *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *34-35 (YouTube removing and restricting user's videos); *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1095 (N.D. Cal. 2015), *aff'd*, 697 F. App'x 526 (9th Cir. 2017) (Facebook removing user's page); *King v. Facebook, Inc.*, 2019 U.S. Dist. LEXIS 151582, at *8-10 (N.D. Cal. Sept. 5, 2019), *aff'd*, 845 F. App'x 691 (9th Cir. 2021) (claims arising from Facebook "removing [plaintiff's] posts, blocking his content, or suspending his accounts"); *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 35 (2021) (Twitter banning user and blocking content); *Mezey v. Twitter, Inc.*, 2018 U.S. Dist. LEXIS 121775, at *1, *3 (S.D. Fla. July 19, 2018) (suspension of Twitter account). This case is no different.

## VI.    PLAINTIFFS' CLAIMS AGAINST MR. PICHAI MUST BE DISMISSED

Plaintiffs' conclusory claims against Mr. Pichai fail on independent grounds. Plaintiffs do not allege any personal actions that gave rise to their claims or any plausible basis for vicarious

1   liability. *See CHD*, 2021 U.S. Dist. LEXIS 121314, at \*23 (dismissing claim against Facebook

2   CEO because plaintiffs "do[] not plausibly allege that he was personally involved in or directed

3   the acts challenged in this lawsuit"). To the contrary, Plaintiffs allege only innocuous public facts

4   about Mr. Pichai, with the conclusory addition that, because he is CEO of YouTube's parent

5   company, he is "responsible for the acts … of YouTube." AC ¶ 28; *see also* AC ¶¶ 46-47, 71, 253-

6   54. Courts rightly disregard such "bald and conclusory allegations regarding [an executive's or

7   supervisor's] personal involvement." *CHD*, 2021 U.S. Dist. LEXIS 121314, at \*28-29.

8   **VII.    EQUITY AND THE FIRST AMENDMENT RULE OUT AN INJUNCTION**

9        Former President Trump's inability to show any likelihood of success on the merits is

10   sufficient to deny his requested preliminary injunction. But even apart from the merits, Plaintiff

11   cannot carry his burden of showing irreparable harm, that the balance of equities tip in his favor,

12   or that an injunction is in the public interest. *Garcia*, 786 F.3d at 740.

13        ***Irreparable Harm.*** As an initial matter, Plaintiff waited over seven months after his

14   YouTube account was suspended to seek a preliminary injunction. This "long delay before seeking

15   a preliminary injunction implies a lack of urgency and irreparable harm." *Garcia*, 786 F.3d at 746.

16   That alone warrants denial of his motion. But even overlooking that, Plaintiff cannot show

17   irreparable harm. He argues that the loss of First Amendment freedoms "unquestionably

18   constitutes irreparable injury." PI at 27. But this principle cuts *against* an injunction here.

19   Plaintiff's First Amendment claim is meritless—and has been rejected by an unbroken line of

20   cases. And the injunction he seeks would actually cause irreparable harm to YouTube's

21   constitutional rights. *See supra* at § III.B; *infra* at 35-36.

22        Plaintiff also claims that he has lost his ability to communicate with his audience through

23   YouTube. But the loss of a platform for speech in a private forum does not constitute irreparable

24   harm. *See, e.g.*, *Salt Lake Trib. Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003).

25   And Mr. Trump has access to other platforms and means of communicating. Indeed, he recently

26   announced the launch of his own "social media company." *See* https://www.tmtgcorp.com/press-

27   releases/announcement-10-20-2021/. Plaintiff has multiple avenues to broadcast his views to

28

1   anyone who wants to listen.[6] Plaintiff similarly claims "irreparable damage to the Republican

2   Party's prospects in the 2022 and 2024 elections." PI at 28. Beyond offering no support for this

3   speculation, Mr. Trump lacks standing to seek an injunction on behalf of the Republican Party,

4   which is not a party and maintains its own YouTube channel (https://www.youtube.com/c/GOP).

5       ***Balance of Hardships & Public Interest.*** Finally, the balance of hardships and the public

6   interest weigh strongly against injunctive relief. The proposed injunction would compel YouTube

7   to "lift all temporary or permanent bans on [his] YouTube channel," to reinstate all videos

8   previously removed, and to allow the sale of merchandise on his channel. PI at 29-30. In short,

9   Mr. Trump seeks to force YouTube to publish material it has determined violates its editorial

10  standards. Such an injunction would be unconstitutional. It is a paradigmatic violation of the First

11  Amendment to compel a publisher "to publish that which reason tells them should not be

12  published"—especially on matters involving political speech. *Tornillo*, 418 U.S. at 256; *accord*

13  *Assocs. & Aldrich*, 440 F.2d at 136 ("nothing in the United States Constitution … allows us to

14  compel a private newspaper to publish advertisements without editorial control of their content

15  merely because such advertisements are not legally obscene or unlawful"); *Chi. Joint Bd., v. Chi*

16  *Tribune Co.*, 435 F.2d 470, 478 (7th Cir. 1970) (rejecting injunction compelling newspaper to run

17  advertisement); *Person v. N.Y. Post Corp.*, 427 F. Supp. 1297, 1301-02 (E.D.N.Y. 1977) (First

18  Amendment bars enjoining publisher from applying allegedly "deceptive editorial policy" where

19  it "selectively publishes tombstone ads and slants news stories in favor of corporations who are,

20  presently or prospectively, large advertisers"). This "use of the State's power violates the

21  fundamental rule of protection under the First Amendment, that a speaker has the autonomy to

22  choose the content of his own message." *Hurley*, 515 U.S. at 573.

23      That is all the more so because the proposed injunction would require YouTube to

24  _____

25      [6] Mr. Trump also claims that his suspension from YouTube caused the "demise of the Trump Campaign merchandising and fundraising program." PI at 27. He offers no evidence to support

26  this hyperbolic assertion—and public reporting belies it. *See* https://www.washingtonpost.com/politics/trump-fundraising/2021/10/29/5b5a2e64-31b1-11ec-

27  a1e5-07223c50280a_story.html? (describing Mr. Trump's "fundraising juggernaut" that has raised over $100 million this year). And any loss of money is, by definition, not irreparable injury. *See*

28  *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015).

subsidize Plaintiff's speech by providing him a free platform to disseminate his speech, with YouTube footing the costs of storing and transmitting that content. Veitch Decl. ¶ 17. *See Harris v. Quinn*, 573 U.S. 616, 656 (2014) (affirming the "bedrock principle that, except perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support"); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1255-56 (11th Cir. 2021) ("forcing [Amazon] to donate to an organization it does not wish to promote" would "modify the content of [its] expression and violate the First Amendment). It would also compel YouTube to reinstate and associate with particular videos— including those relating to the Capitol riots—that it has found to be objectionable and indeed potentially dangerous. These harms to YouTube's ability to "exercise editorial discretion over the speech and speakers" in its private forum (*Halleck*, 139 S. Ct. at 1930) far outweigh whatever benefits Plaintiff would get from the injunction he seeks. *See Chi. Joint Bd.*, 435 F.2d at 478 ("The Union's right to free speech does not give it the right to make use of the defendants' printing presses and distribution systems without defendants' consent").

Nor has Plaintiff shown that the injunction would benefit the public interest. Indeed, there is a "significant public interest in upholding First Amendment principles," *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002), and the proposed injunction would do the opposite. Plaintiff argues, without offering any actual evidence, that his suspension creates a "negative impact on political debate." PI at 29. But Mr. Trump has not been stopped from speaking—only from posting videos to YouTube. And a "Government-enforced right of access inescapably dampens the vigor and limits the variety of public debate." *Tornillo*, 418 U.S. at 257.

## CONCLUSION

Plaintiffs' Amended Complaint should be dismissed with prejudice, and Mr. Trump's motion for a preliminary injunction should be denied.

Dated:  December 2, 2021

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:   */s/ Brian M. Willen*
Brian M. Willen
bwillen@wsgr.com

1

2

Attorneys for Defendants
YOUTUBE, LLC and SUNDAR PICHAI

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28