JOHN P. COALE *(pro hac vice)*
2901 Fessenden Street NW
Washington, D.C. 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY *(pro hac vice)*
MICHAEL J. JONES *(pro hac vice)*
RYAN TOUGIAS *(pro hac vice)*
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

FRANK C. DUDENHEFER , JR. *(pro hac vice)*
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

Attorneys for Plaintiffs

ANDREI POPOVICI (234820)
MARIE FIALA (79676)
LAW OFFICE OF ANDREI D. POPOVICI,
P.C.
2121 North California Blvd. #290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
Facsimile: (650) 530-9990
Email: andrei@apatent.com
Email: marie@apatent.com

RICHARD POLK LAWSON *(pro hac vice)*
GARDNER BREWER MARTINEZ
MONFORT
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gbmmlaw.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DONALD J. TRUMP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> YOUTUBE, LLC. et al., <br><br> Defendants. | Case No: 4:21-cv-08009-JSW <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hon. Jeffrey S. White |

1

## **<u>TABLE OF CONTENTS</u>**

2

I.      INTRODUCTION ................................................................................................... 1

3

II.     STATEMENT OF FACTS ..................................................................................... 2

4
        A.      Procedural Background ................................................................................ 2

        B.      Factual Allegations ...................................................................................... 3

5

III.    OPPOSITION TO DEFENDANTS' MOTION TO DISMISS ................................. 6

6
        A.      Plaintiffs' Alleged Facts Must Be Taken as a Whole and Accepted as True ................. 6

7       B.      The State Action Issue Is Inherently Unsuited for Disposition on This Motion ............ 6

        C.      *Halleck* and *Prager* Have No Bearing on This Case. ....................................... 7

8
        D.      Plaintiffs Have Pleaded State Action by Means of Compulsion ............................. 7

9           1.  Origins of the Compulsion Theory .......................................................... 8

10          2.  The Specificity Issue:  Plaintiffs Belong to a Class of Citizens Targeted by the Government. ............................................................................. 9

11              (a)     Laws of General Applicability—No State Action ................................. 10

12              (b)     State Action That Targets Identified Groups—This Case ....................... 10

13              (c)     The "Particular Case" Fallacy—*Doe*, *Daniels*, and *CHD* ............... 11

            3.  Plaintiffs Have Amply Alleged Coercive Statements by State Actors. ................. 13
14
                (a)     Defendants Improperly Urge the Court to Decide a Question of Fact—Whether the Extensive Alleged Government Officials' Statements Amount to Coercion .............. 13
15
                (b)     Plaintiffs Have More Than Plausibly Alleged Coercion. ........................ 14
16
                (c)     Defendants Misstate the Legal Standard for Coercion. .......................... 16

17          4.  Threats by Individual Officials Suffice to Create State Action. ...................... 16

18          5.  Plaintiffs Have Pleaded the "Something More" Needed to Maintain a Claim Against a Private Party. ......................................................................... 18

19      E.      Section 230(c) Itself Provides Government Encouragement of Defendants' Conduct .. 18

20          1.  State Action Can Consist of Enabling Discriminatory Private Conduct ................. 19

21          2.  The State Also "Acts" When It Allocates Property Rights. ............................ 21

            3.  Defendants' Other Citations Are Inapposite. ......................................... 21
22
        F.      Joint Action Also Is Sufficiently Pleaded ................................................ 22
23
        G.      Plaintiffs Have Standing to Challenge the Constitutionality of Section 230. .......... 24

24      H.      Plaintiffs' Claims Under Florida Law Are Viable. ...................................... 25

25          1.  The Choice-of-Law Provision Does Not Foreclose the FDUTPA Claim. ................... 25

            2.  Defendants' Failure to Disclose Material Information Is Actionable. .................. 26
26
            3.  Plaintiffs' Allegations Under the SSMCA Are Sufficient. ............................ 27

            4.  Constitutional Issues ............................................................... 28
27
            5.  Section 230(c)(1) Does Not Bar Plaintiffs' State Law Claims. ....................... 30

28      I.      Defendant Pichai Is Properly Before This Court. ...................................... 31

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.   REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION....... 31**

   A.   Likelihood of Success on the Merits .................................................................. 31

   B.   Irreparable Harm ................................................................................................. 32

   C.   The Balance of Equities Favors Injunctive Relief ........................................... 33

   D.   The Public Interest Favors Injunctive Relief.................................................... 34

**V.    CONCLUSION............................................................................................ 35**

# TABLE OF AUTHORITIES

Cases

*Abu-Jamal v. Nat'l Public Radio*, 1997 WL 527349 (D.D.C. Aug. 21, 1997), *aff'd*, 159 F.3d 635 (D.C. Cir. 1998) ................................................................................................................... 17

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 ............................................................... 11, 22

*Ahern v. Mayo Clinic*, 180 So.3d 165 (Fla. 1st DCA 2015) ...................................... 26, 27

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ...................... 33

*American Family Ass'n v. City of San Francisco*, 277 F.3d 1114 (9th Cir. 2002) ........ 14

*Arc of Calif. v. Douglas*, 757 F.3d 975 (9th Cir. 2014) .................................................. 33

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................ 6

*Atkinson v. Meta Platforms*, 2021 WL 5447022 (9th Cir. Nov. 22, 2021) .................... 22

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) .................................... 15, 32

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 59 (1963) ................................... 1, 2, 14, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................ 6, 15, 23

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) ..................................................... 14

*Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) ...... 32

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) ......................................... 11

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ................................................................... passim

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) ............. 7

*Brodheim v. Cry*, 584 F.3d 1262 (9th Cir. 2009) ......................................................... 16

*Brunette v. Humane Society of Ventura County*, 294 F.3d. 1205 (9th Cir. 2002) ......... 23

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1962) ............................................. 2

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So.3d 164 (Fla. 4th DCA 2015) ................................................................................................. 27

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987) 9, 15, 16

*Children's Health Defense v. Facebook Inc.*, 2021 WL 2662064 (N.D. Cal. June 29, 2021) passim

Citizens United v. Federal Election Comm'n, 558 U.S. 310 (2010) ............................... 35

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) ....................................................... 25

*Collins v. Womancare*, 878 F.2d 1145 (9th Cir. 1989) ................................................. 22

*Conservation Force v. Delta Air Lines, Inc.* 190 F.Supp.3d 606 (N.D. Tex. 2016) ....... 29

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ................. 6, 19

*Daniels v. Alphabet, Inc.*, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) .............. passim

*Doe v. Google LLC*, 2021 WL 4864418 (N.D. Cal. Oct. 19, 2021) ..................... 9, 10, 11, 13

*Donald J. Trump, et al., v. Facebook Inc., et al.,* Civ. No.: 4:21-cv-09044-JSW ............ 3

*Donald J. Trump, et al., v. Twitter, et al.*, Civ. No.: 3:21-cv-08378-JD .......................................... 3

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................................ 10

*Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214 (1989) ........................ 35

*Fed. Trade Comm'n v. Gratz*, 253 U.S. 421 (1920) .................................................................. 30

*FTC v. AT&T Mobility, LLC*, 883 F.3d 848 (9th Cir. 2017)...................................................... 29

*Fyk v. Facebook, Inc.*, 2019 WL 11288576 (N.D. Cal. June 18, 2019).................................. 30, 31

*Gonzales v. Carhart*, 550 U.S. 124 (2007). ............................................................................... 24

*Grocery Mfrs. Ass'n v. Sorrell*, 102 F.Supp.3d 583 (D. Vt. 2015) ........................................... 30

*Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983) ...................................... 14

*Heineke v. Santa Clara University*, 965 F.3d 1009 (2020)........................................ 10, 11, 12, 13

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721 (7th Cir. 2009) ............................................................................................................................... 33

*Howey v. U.S.*, 481 F.2d 1187 (9th Cir. 1973)........................................................................... 35

*In re Facebook Biometric Information Privacy Litig.*, 185 F. Supp.3d 1155 (N.D. Cal. 2016).... 26

*In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738 (N.D. Cal. May 9, 2011) ................................................................................................................................. 6

*Iowa-Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239 (1931) .......................................... 17, 18

*Johnson v. Knowles*, 113 F.3d 1114 (9th Cir. 1997).................................................................. 16

*KC Leisure, Inc., v. Haber*, 972 So.2d 1069 (Fla. 5th DCA 2008)............................................. 31

*Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018) ......................................................................... 6

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ....................................................................... 4

*Knight First Amendment Inst. et al v. Trump*, 928 F.3d 226 (2d Cir. 2019).............................. 2

*Lavigne v. Herbalife, Ltd.* 2019 WL 6721619 (C.D. Cal. Oct. 22, 2019).................................. 26

*Lewis v. Google LLC*, 461 F.Supp.3d 938 (N.D. Cal. 2020) .................................................... 24

*Lombard v. Louisiana*, 373 U.S. 267 (1963) ..................................................................... passim

*Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982)....................................................... 7, 18

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)................................................................ 25

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S.Ct. 1921 (2019)........................................... 7

*Mathis v. Pacific Gas & Elec. Co.*, 891 F.2d 1429 (9th Cir. 1989) ........................... 11, 14, 15, 16

*Mendocino Env. Ctr. v. Mendocino Cty.*, 192 F.3d 1283 (9th Cir. 1999).................................. 23

*Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646 (9th Cir. 1988) ................................................ 4

*Nat'l Fed'n of the Blind v. Target Corp.*, 452  F.Supp.2d 946 (N.D. Cal. 2006) ........................ 30

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976)................................................................ 32

*NetChoice v. Moody*, 2021 WL 2690876 (N.D. Fla. June 30, 2021)..................................... 28, 30

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003)................................................................ 16

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ......................................................... 1

*Pasadena Republican Club v. W. Justice Ctr.*, 985 F.3d 1161 (9th Cir. 2021) ........................... 23

*Peterson v. City of Greenville*, 370 U.S. 935 (1963) .......................................................... passim

*Prager Univ. v. Google LLC*, 951 F.3d 991 (9th Cir. 2020)................................................ 7, 29

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) .................................................... 29

*Railway Employees' Dept. v. Hanson*, 351 U.S. 225 (1956) ....................................... 19, 20, 21

*Reitman v. Mulkey*, 387 U.S. 369 (1967) ................................................................. 8, 19, 21

*Reno v. ACLU*, 521 U.S. 844 (1997)............................................................................. 34

*Roberts v. AT&T Mobility LLC*, 877 F.3d 833 (9th Cir. 2017)............................................... 22

*Robinson v. Florida*, 378 U.S. 153 (1964) .................................................... 8, 10, 16, 20

*Romer v. Evans*, 517 U.S. 620 (1996)............................................................................. 8

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) .......................................................................... 29

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989)....................................... 20, 21

*Starbuck v. City & County of San Francisco*, 556 F.2d 450 (9th Cir. 1977)................................. 9

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999) ............... 7, 10, 18

*Terry v. Adams*, 345 U.S. 461 (1952) .................................................................... 17, 18

*Townsend v. Univ. of Alaska*, 543 F.3d 478 (9th Cir. 2008)................................................. 35

*Trump v. International Refugee Assistance Project*, 137 S.Ct. 2080 (2017)............................... 33

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) .............................................. 22

*U.S. Telecom Ass'n v. FCC* 825 F.3d 674 (D.C. Cir. 2016) ............................................... 29

*United States v. Classic*, 313 U.S. 299 (1941)........................................................... 17, 18

*United States v. Davis*, 482 F.2d 893 (9th Cir. 1973)................................................... 11, 16

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) .................................................... 4

*United States v. Ross*, 32 F.3d 1411 (9th Cir. 1994)................................................... 11, 16

*Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043 (N.D. Cal. 2018) ...................................... 26

*Willis v. City of Fresno*, 2014 WL 4211087 (E.D. Cal. Aug. 26, 2014)................................... 9

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008)............................................ 31

*Winters v. New York*, 333 U.S. 507 (1948) .................................................................. 29

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) .......................................... 28

*Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007) .......................................................... 14

Statutes

15 U.S.C. §§ 41-58 .................................................................................................... 29

15 U.S.C. §1 .............................................................................................................. 6

42 U.S.C. § 1983 ...................................................................................................... 22

47 U.S.C. § 230(a)(3) ............................................................................................... 35

47 U.S.C. § 230(c) ..................................................................................................... 1

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ................................................................ 26

Cal. Bus. & Prof. Code §§ 17204 *et seq.* ................................................................ 26

Fla. Deceptive and Unfair Trade Prac. Act, Fla. Stat. §§ 501.201 *et seq.* ........... 3, 26, 27

Fla. Stat. § 501.2041(2)(a) & (b) ............................................................................. 27

Rules

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 6, 7

> *"It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments ... [T]he freedoms of expression must be ringed about with adequate bulwarks."*
>
> – Justice Brennan in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 59 (1963).

## I.   INTRODUCTION

This case raises one of the most important First Amendment issues of the current era:  Can the government coerce or co-opt a private, multi-billion dollar social media company to achieve a goal—the censorship of disfavored political speech—that the Constitution prohibits it from achieving directly?  Social media platforms are "the most powerful mechanisms available to a private citizen to make his or her voice heard."  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).  YouTube, owned by Alphabet, the parent company of Google, is the largest video distribution platform in the world, boasting more than *two billion users*.  Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c), immunizes Defendants from liability for, *inter alia*, content they choose to ban from their platform.  Enacted in 1996, Section 230 was originally a federal subsidy to facilitate the growth of the Internet in its infancy, but its beneficiaries have since overtaken large segments of the economy.  Alphabet's market capitalization now exceeds $1.8 trillion; the value of its YouTube subsidiary is directly attributable to this congressional grace.[1]  YouTube ostensibly is an ordinary privately-owned, privately-operated company.  However, beholden as Defendants are to this multi-billion-dollar federal subsidy, they must adhere to the preferences of their government overseers, who hold the power to dismantle, not just their business model, but the entire industry.

Defendants permanently banned then-President Trump from their platform for engaging in constitutionally protected speech, in his official capacity, on a government account with millions of active participants.  The Second Circuit has held that Mr. Trump's similar Twitter account constituted a public forum, and the same is true here.  *Knight First Amendment Inst. v. Trump*,

---

[1] *See* First Amended Complaint ("FAC") ¶¶ 29-31; Declaration of Andrei Popovici and Plaintiffs' Request for Judicial Notice ("RJN"), filed herewith, ¶ 8 (Alphabet Form 10-K).

928 F.3d 226, 237 (2d Cir. 2019), *vacated as moot*, 141 S.Ct. 1220 (2021).  Defendants' overtly partisan censorship resulted in the prior restraint of millions of Americans' freedom to participate in the public discourse, contrary to First Amendment principles deeply rooted in American history and law.

Against this backdrop, this Court need only answer a limited question—does Plaintiffs' exhaustively detailed FAC allege sufficient facts to make out the claims pleaded?  Plaintiffs have alleged in great detail that the federal government's entanglement with Defendants' "content moderation" program (a euphemism Orwell would have loved) creates state action and thus makes Defendants' actions subject to First Amendment limitations.  Specifically, state action exists by virtue of (1) government coercion, including directing Defendants and other social media platforms to target then-President Trump and his supporters; (2) substantial encouragement of Defendants' censorship by official exhortations coupled with the threatened withdrawal of Section 230 immunity; and (3) as Defendants have admitted, joint action with the government to suppress disfavored speech.  Plaintiffs' claims supported by decades of Supreme Court and Ninth Circuit jurisprudence holding that even officials' informal statements urging private entities to discriminate against classes of citizens give rise to state action, whether or not specific individuals were targeted by name.  *See, e.g.*, *Lombard v. Louisiana*, 373 U.S. 267 (1963).

This is a quintessentially fact-intensive inquiry.  "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."  *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1962).  Plaintiffs have alleged ample facts demonstrating that public officials "deliberately set about to achieve the suppression of [speech] deemed 'objectionable.'"  *Bantam Books*, 372 U.S. at 68.  That is enough for this case to move forward.

## II.    STATEMENT OF FACTS

### A.    Procedural Background

This case was filed on July 7, 2021, in the Southern District of Florida, simultaneously with virtually identical cases against Twitter and Facebook.  The FAC was filed on July 27, 2021. Dkt. 21.  Plaintiffs, on behalf of a putative class, allege that government officials coerced,

1  encouraged, and/or collaborated with Defendants to censor Plaintiffs' speech.  As a result,

2  Defendants' censorship is subject to constitutional constraints by virtue of the state action

3  doctrine, and Defendants violated the First Amendment when they censored Plaintiffs.  The FAC

4  further alleges that Section 230(c) of the Communications Decency Act is unconstitutional as

5  applied and that Defendants' conduct is unlawful under the Florida Deceptive and Unfair Trade

6  Practices Act ("FDUTPA").  Plaintiff Trump filed a motion for preliminary injunction on August

7  23, 2021.  Dkt. 43.  This case was transferred to this Court on October 6, 2021.[2]

8  ### B.    Factual Allegations

9  The FAC details a litany of events where members of Congress and the Executive Branch

10  coerced Defendants and other social media platforms to censor disfavored speech on pain of

11  catastrophic legal and/or regulatory consequences.  *See* FAC ¶¶ 63-73, 108-09, 142-158 (detailing

12  officials' statements).  Legislators publicly threatened to take punitive measures against

13  Defendants if they continued to provide a platform for President Trump and those who espoused

14  his views.  In particular, public officials made it clear that they wanted then-President Trump

15  permanently banned from social media platforms.  *See, e.g.*, FAC ¶ 67.[3]  The threatened sanctions

16  for Defendants' noncompliance included increased regulation, antitrust scrutiny, and repeal of the

17  Defendants' Section 230 immunity.  *See, e.g., id.*  ("[F]or the privilege of 230, there has to be a

18  bigger sense of responsibility on it.  And it is not out of the question that that could be removed."

19  House Speaker Nancy Pelosi, Apr. 12, 2019); ("Section 230 should be revoked, immediately

20  should be revoked, number one.  For Dorsey and other platforms."  President-elect Joe Biden,

21  *New York Times,* Jan. 19, 2020).

22

23  [2] The *Twitter* and *Facebook* cases also were transferred to this District.  The former was assigned to the Hon. James Donato.  *Donald J. Trump, et al., v. Twitter, et al.*, Civ. No.: 3:21-cv-08378-

24  JD.  The latter is before this Court  *Donald J. Trump, et al., v. Facebook Inc., et al.,* Civ. No.: 4:21-cv-09044-JSW.

25  [3] Prominent legislators specifically called for President Trump to be banned.  *See* FAC ¶ 65 ("Trump is willing to do anything for himself … And until he stops, Facebook must ban him.

26  Which is to say, forever."  (Rep. Adam Schiff, May 5, 2021)); (Presidential candidate Senator Kamala Harris publicly called for Twitter to suspend President Trump's account).  Even though

27  these statements did not mention YouTube by name, it is more than reasonable to infer that Defendants—having been consistently the subject of  government calls for censorship, along with

28  Twitter and Facebook—also sat up and took notice.

Legislators also held hearings to which Alphabet's CEO was summoned, during which legislators threatened to impose regulations and strip YouTube of its Section 230 immunity.  The coercive, viewpoint-discriminatory statements by legislators at these official proceedings shock the conscience of any American concerned with the erosion of First Amendment rights:

> The time has come to hold online platforms accountable … [T]herefore, **it is time for Congress and this Committee to legislate and realign these companies' incentives** to effectively deal with disinformation and extremism. …  So when a company is actually promoting this harmful content, **I question whether existing liability protections should apply**.  Members on this Committee have suggested legislative solutions and introduced bills.  The Committee is going to consider all these options so that we can finally align the interests of these companies with the interests of the public and hold the platforms, and their CEOs, accountable when they stray.  That is why you are here today, Mr. Zuckerberg, Mr. Pichai, and Mr. Dorsey. …**The time for self-regulation is over.  It is time we legislate to hold you accountable**.  FAC ¶ 58; "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation": Hearing before H. Comm. on Energy and Com., 117th Cong. (March 25, 2021) ("March 2021 Hearing") (Opening Stmt. of Comm. Chairman Frank Pallone, Jr. (Dem.)) (emphasis added); RJN ¶ 3.[4]

> Your companies need to be held accountable—we need rules, regulations, technical experts in government, and audit authority of your technologies.  Ours is the committee of jurisdiction, and **we will legislate to stop this**.  *Id*. (Opening Stmt. of Rep. Mike Doyle (Dem)); (emphasis added); RJN ¶ 4.

> What our witnesses need to take away from this hearing is that self-regulation has come to the end of its road, and that this democratically elected body **is prepared to move forward with legislation and regulation**.  *Id*. (Opening Stmt. of Rep. Janice D. Schakowsky (Dem.)); (emphasis added); RJN ¶ 5.

> YouTube [has] been successfully weaponized by racists and are being used to … spread racist content and lies …**Congress will have to compel you, compel you perhaps with penalties, to make meaningful changes**.  *Id*. (Quote from Rep. G.K. Butterfield (Dem.)) (Tr. at 861:1987-90; 881:2019-2021) (emphasis added); RJN ¶ 2.

> [T]he companies before us today aren't doing enough ... I think **Congress must revisit Section 230**."  *Id*. (Quote from Rep Doris Matsui (Dem.)) (Tr. at 941:2177-78, 2180-81) (emphasis added); RJN ¶ 2.

> **[P]ursuant to 230, you all** [YouTube, Twitter, and Facebook] **can't be sued.** You have immunity. But it ain't 1996 anymore, is it? Meanwhile, lies are spreading like wildfire through platforms. … And the reason is your algorithms… **What specific changes to**

---

[4] A court may consider judicially noticeable materials without converting a motion to dismiss into a motion for summary judgment.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988).  Furthermore, under the "incorporation by reference" doctrine, a court may "take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'"  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

1  **Section 230 do you support to ensure more accountability**?  *Id.* (Quote from Rep.
Darren Soto (Dem.)) (Tr. at 1681:3998-4001; 1691:4016-17) (emphasis added); RJN ¶ 2.

2  Defendants responded to the government pressure.  According to an official House source,

3  "These platforms [YouTube, Twitter, and Facebook] often **ramp up their efforts** against

4  [conservative] content in response to social **and political** pressure."[5]  Defendant Pichai admitted

5  in congressional testimony that YouTube had been "taking guidance" from government officials

6  before "proactively removing information."  He further agreed that YouTube would be "happy to

7  work and cooperate" with the federal government "to better track and remove harmful content"

8  from the site.[6]  Officials in the Executive Branch, including the current President and leaders of

9  federal agencies, have publicly stated that they have coordinated with Defendants and other social

10  media platforms to censor speech that the government regards as undesirable, including former

11  President Trump's views on election fraud and the origin of, and treatments for, COVID.  FAC

12  ¶¶ 110-11.  The White House has confirmed that Executive Branch officials regularly "engage"

13  with social media platforms at the highest levels to promote speech preferred by the government,

14  including creating a "robust enforcement strategy" to ban contrary views:  "There are also

15  proposed changes that we have made to social media platforms … we have recommended [] that

16  they create a robust enforcement strategy."  *Id.* ¶¶ 142-43.  *See also id.* ¶ 143 (We're asking

17  [social media companies] to monitor misinformation more closely. We're asking them to

18  consistently take action against misinformation … on their platforms.")  The White House made

19  clear that bans should be implemented consistently across platforms: "You shouldn't be banned

20  from one platform and not others … for providing misinformation out there."  *Id.* ¶ 144.  The

21  White House has gone so far as to point out specific narratives to be censored:  "So we are …

22  regularly making sure social media platforms are aware of the latest narratives dangerous to

23

24  ───────────────
[5] FAC ¶ 71; March 2021 Hearing, (Memo. from Chairman Pallone prepared by Staff) (emphasis
added); RJN ¶ 6.

25
[6] FAC ¶ 71; March 2021 Hearing, (Testimony of Sundar Pichai) (Tr. at 931:2152-54; 2071:4945-
26  46, 4962-63); RJN ¶ 2.  *See also* FAC ¶ 67; "Does Section 230's Sweeping Immunity Enable Big
Tech Bad Behavior": Hearing before S. Comm. on Commerce, Science and Transportation, 117th
27  Cong. (Oct. 28, 2020) (Transcription of testimony of Sundar Pichai); RJN ¶ 9 (Pichai agrees with
Sen. Blumenthal that YouTube has "a plan" to suppress questions about integrity of 2020
28  elections).

public health that we and many other Americans seeing ….." *Id.*  Defendants banned President Trump from their platform on January 12, 2021.  Due to sustained government pressure, the ban continues to this day.  FAC ¶ 6.  In effect, the government has acted as a "Ministry of Truth" and has conscripted and/or enlisted Defendants to act as its agents in blocking disfavored speech.

## III.    OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### A.    Plaintiffs' Alleged Facts Must Be Taken as a Whole and Accepted as True.

As the Supreme Court explained in *Ashcroft v. Iqbal*, "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).[7]  On this motion, all well-pleaded allegations of material fact are taken as true and construed most favorably to the non-moving party.  *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018).  Moreover, "plaintiffs should be given the full benefit of their proof **without tightly compartmentalizing the various factual components** and wiping the slate clean after scrutiny of each."  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (emphasis added); *see In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *10-11 (N.D. Cal. May 9, 2011) (applying *Cont'l Ore* on motion to dismiss).[8]

### B.    The State Action Issue Is Inherently Unsuited for Disposition on This Motion.

In determining whether state action exists, the Court must engage in a nuanced and

---

[7] *Ashcroft* and *Twombly* are frequently erroneously cited by defendants, and even some courts, for the proposition that, to survive a Rule 12(b)(6) motion, a complaint must be "plausible on its face."  *See* MTD at 6.  That is incorrect.  In both of those cases, the Supreme Court applied the "plausibility" standard in assessing the viability of Sherman Act § 1 *conspiracy* allegations.  *See, e.g.*, *Twombly*, 550 U.S. at 556 (pleading a Section 1 claim requires complaint to provide "plausible grounds to infer an agreement").  That rule makes sense in a cartel case that otherwise could sweep defendants into years of litigation, with the threat of treble damages, based on a bare allegation of what could be lawful parallel conduct.  It has no application here.

[8] Despite having moved under Rule 12(b)(6), Defendants have interjected extraneous and impermissible factual assertions into their argument.  *See, e.g.*, MTD at 4 (YouTube applies its policies in "fair and evenhanded way"); *id.* (YouTube removed President Trump's video on ground "it included false information about the outcome of the 2020 election); *id.* at 10 (government officials' statements not "sufficiently coercive").  The Court not only should, but must, disregard Defendants' factual assertions when deciding this motion.

1    "necessarily fact-bound" inquiry, *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982), to

2    which no single rubric can supply the answer.  "[T]o fashion and apply a precise formula for

3    recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which

4    '[t]his Court has never attempted.'"  *Burton,* 365 U.S. at 722 (citation omitted).  *See also*

5    *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (existence of

6    state action "is a matter of normative judgment, and the criteria lack rigid simplicity … [no] one

7    fact can function as a necessary condition across the board ... nor is any set of circumstances

8    absolutely sufficient").  The state's entanglement can consist solely of "winks and nods."  *Id*. at

9    301.  The weighing of the opposing values and interests found in different cases will lead to

10   different results.  This inquiry is ill-suited to a Rule 12(b)(6) motion.

11          **C.**      ***Halleck*** **and** ***Prager*** **Have No Bearing on This Case.**

12          Defendants begin their argument by citing *Manhattan Cmty. Access Corp. v. Halleck*, 139

13   S.Ct. 1921 (2019), and *Prager Univ. v. Google LLC*, 951 F.3d 991 (9th Cir. 2020), as grounds for

14   dismissal.  MTD at 7-8.  Neither case is relevant.  In *Halleck*, the Supreme Court rejected the

15   theory that a private entity that operates its property "as a public forum" becomes a state actor.

16   139 S.Ct. at 1926.  Plaintiff in *Prager* argued that YouTube is a state actor "because it performs a

17   public function."  951 F.3d at 998.  Plaintiffs here do not invoke the public forum or public

18   function theories; they allege state action only by means of government compulsion and joint

19   action, two of four tests for finding state action in cases against private actors.  *Sutton v.*

20   *Providence St. Joseph Medical Center*, 192 F.3d 826, 835-36 (9th Cir. 1999).

21          **D.       Plaintiffs Have Pleaded State Action by Means of Compulsion.**

22          Under the compulsion theory, a private decision has sufficiently received the imprimatur

23   of government to make it state action where the state has exercised coercive power to shape

24   private conduct.  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  The requisite nexus between the

25   State and the challenged private actions has been found in a variety of circumstances, ranging

26   from the State expressly mandating odious distinctions by private entities, *Peterson v. City of*

27   *Greenville*, 370 U.S. 935 (1963) (requiring racial separation in restaurants), to removing legal

28   barriers that would have kept private parties from trampling on constitutional rights, *Reitman v.*

1   *Mulkey*, 387 U.S. 369 (1967) (state law repealed legal barrier prohibiting private actors from

2   discriminating in housing sales and rentals).  *Cf. Romer v. Evans*, 517 U.S. 620 (1996) (state law

3   precluding any government action designed to protect persons based on sexual orientation

4   violated Equal Protection Clause).  Plaintiffs' allegations fit comfortably on the spectrum of fact

5   patterns which the courts have found to constitute compulsion, and thus state action.

6   **1.    Origins of the Compulsion Theory**

7       The Supreme Court's compulsion theory cases amply support its application on the facts

8   alleged here.  The doctrine had its genesis in three civil rights cases where the interplay of

9   government and private businesses maintained racial segregation.  Finding state action in

10  *Peterson,* 370 U.S. 935, was easy.  A private lunch counter had barred Black customers in

11  compliance with a city ordinance requiring segregation in restaurants.  The Supreme Court found

12  that the private actor's conduct violated the Equal Protection Clause because the State had

13  commanded that particular result.  Notably, the Court did not require that the targets of state

14  action be identified *specifically and individually*.  It was enough that the ordinance targeted a

15  broad and undifferentiated, but identifiable, class of citizens.

16      In *Robinson v. Florida*, 378 U.S. 153 (1964), again, a restaurant denied service to Black

17  customers.  While segregated dining was not mandated by law, health regulations required

18  separate restroom facilities in any establishment serving both races.  Defendants, Black restaurant

19  patrons who refused to leave, were arrested and convicted of trespass; they challenged their

20  conviction as a violation of Equal Protection.  The Supreme Court reasoned that, while the

21  restroom regulations did not forbid integrated service, "they certainly embody a state policy

22  putting burdens upon any restaurant which serves both races."  *Id.* at 156-57.  This government

23  entanglement, although indirect, rendered otherwise private conduct as state action.  Again, the

24  offending regulation did not specifically target any individual.

25      Most significantly for present purposes, *Lombard*, 373 U.S. 267, involved *no formal*

26  *governmental action* at all.  Black patrons were denied service at an all-White restaurant.  The

27  restaurant manager summoned the police after the group refused to leave; they were arrested and

28  convicted of trespass.  The *Lombard* Court located no government ordinance condoning or

1    encouraging segregation.  Nevertheless, the Supreme Court found state action in the fact that the

2    Mayor and Police Chief of New Orleans had given speeches declaiming that "sit-in"

3    demonstrations would not be tolerated.  The Court reasoned that these public statements "must be

4    treated exactly as if [the City] had an ordinance prohibiting such conduct," *id*. at 273, and found

5    the statements sufficient to render the resulting discrimination state action.  Even though no law

6    or other official act had required segregation, the public officials had encouraged private

7    discriminatory practices and thus participated in segregation of public accommodations.

8        Ninth Circuit law is in accord.  *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*,

9    827 F.2d 1291, 1295 (9th Cir. 1987), cited *Peterson* as support for finding state action where a

10   county attorney had merely "advised" the telephone company to disconnect a customer's service

11   or face prosecution if it did not comply.  *Carlin* confirms that the state action inquiry focuses on

12   the *substance* of government coercion rather than the form by which it is communicated.

13       **2.    The Specificity Issue:  Plaintiffs Belong to a Class of Citizens Targeted by the Government.**

14

15       Defendants urge this Court to follow a trio of recent district court decisions holding that,

16   for state action to exist, the government must have compelled or encouraged the unconstitutional

17   treatment in *a specific plaintiff's particular case*.  *Doe v. Google LLC*, 2021 WL 4864418 (N.D.

18   Cal. Oct. 19, 2021); *Children's Health Defense v. Facebook Inc.* ("*CHD*"), 2021 WL 2662064

19   (N.D. Cal. June 29, 2021); *Daniels v. Alphabet, Inc.*, 2021 WL 1222166 (N.D. Cal. Mar. 31,

20   2021); *see* MTD at 11.[9]  To the extent these cases require the targeting of specific individuals as a

21   prerequisite to finding state action, they are contrary to the Supreme Court and Ninth Circuit

22   precedents on which they relied.

23       It is undisputed that a private actor's mere compliance with a generally applicable law is

24   not enough to constitute state action.  But that is not the claim Plaintiffs have alleged.  The public

25   officials' coercive conduct here was directed at former President Trump individually, and also at

26   _____

27   [9] CHD is currently on appeal to the Ninth Circuit (No. 21-16210).  Moreover, "[i]t is axiomatic that district court decisions do not create binding precedent on other district courts."  *Willis v. City of Fresno*, 2014 WL 4211087, at *2 n.1 (E.D. Cal. Aug. 26, 2014), citing *Starbuck v. City & County of San Francisco*, 556 F.2d 450, 457 n.13 (9th Cir. 1977).

28

an identifiable group—speakers who publicly supported President Trump's views on election fraud or the COVID-19 pandemic.  Such government conduct compelling Defendants to censor a distinct group of citizens is state action, just as if officials had exhorted Defendants to ban all Republicans, or women, or LGBTQ people from their platform.  And silencing a group based on their political beliefs is viewpoint discrimination—the core evil the First Amendment was designed to avert.  "[P]olitical belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976).

### (a)     Laws of General Applicability—No State Action

To the extent the state action doctrine incorporates a "specificity" requirement, it is no more than that "compliance with generally applicable laws [is not] sufficient to convert private conduct into state action." *Heineke v. Santa Clara University*, 965 F.3d 1009, 1014 (2020) (citing *Sutton*, 192 F.3d 826). *Sutton* explains the common-sense reason behind this requirement:

> To accept [that] argument would be to convert every employer—whether it has one employee or 1,000 employees—into a governmental actor every time it complies with a presumptively valid, generally applicable law, such as an environmental standard or a tax-withholding scheme.  Private employers would then be forced to defend those laws and pay any consequent damages, even though they bear no real responsibility for the violation of rights arising from the enactment of the laws.

192 F.3d at 838-39.  That scenario bears no resemblance to the facts here.  Plaintiffs do not rely on the existence of a "generally applicable law" as the source of state compulsion.

### (b)     State Action That Targets Identified Groups—This Case

The public officials' challenged actions here were either directed at then-President Trump individually, or else targeted a distinct and identifiable group of citizens—those who echoed his views—for censorship.  *See, e.g.,* FAC ¶¶ 55-60, 75, 84-98, 101-08.  As to then-President Trump, he was identified individually, and thus was the subject of state action even under the overly restrictive "particular case" test applied in *Doe, Daniels,* and *CHD*.  As to the other groups of targeted speakers, they were identified with the particularity required by the Supreme Court civil rights cases discussed above, as well as subsequent decisions.  The Supreme Court had no difficulty finding state action in *Robinson*, *Peterson*, and *Lombard* even though the governmental conduct had not targeted any specific individuals by name.  The conduct in each of those cases

was directed at a particular group—Black Americans—and not at identified individuals.[10]

Later Ninth Circuit decisions have found state action based on similar fact patterns.  For example, in *Mathis v. Pacific Gas & Elec. Co.*, 891 F.2d 1429 (9th Cir. 1989), a worker at a nuclear power plant brought a *Bivens*[11] suit claiming that he had been excluded from the plant without due process for alleged drug use.  The Ninth Circuit found the requisite state action existed in the form of warnings by the Nuclear Regulatory Commission that nuclear licensees needed to control their employees' drug use, or the NRC would do it for them.  At the time, the NRC had not yet taken any formal action—the NRC's first policy statement on drug use was not published until a year later.  Mathis alleged only that the NRC had "pressured" nuclear plant operators.  The NRC's informal actions were not directed at Mathis individually; the Commission didn't even know he existed.  The Ninth Circuit held that, despite this "bare record," "we cannot agree with the conclusion that Mathis' allegations of governmental coercion or encouragement are frivolous or wholly without substance," and allowed his claim to proceed.  *Id*. at 1434.  *See also United States v. Davis*, 482 F.2d 893, 904 (9th Cir. 1973) (passenger search by private airline was state action due to FAA's incipient efforts to create anti-hijacking program, although no federal regulation existed at the time; no claim that FAA specifically directed the particular search); *United States v. Ross*, 32 F.3d 1411, 1413-14 (9th Cir. 1994) (airline's search of passenger's luggage to conform to non-binding FAA guidelines was governmental action; FAA did not mandate searching this or any other individual passenger).  As in these cases, Plaintiffs have alleged government involvement in censorship aimed at a particular group, defined by political viewpoint instead of race, employment, or travel.

### (c)     The "Particular Case" Fallacy—*Doe*, *Daniels*, and *CHD*

*Doe* and *Daniels* purport to take their "treatment of a specific plaintiff" formulation from *Blum* and *Heineke*.  *See Doe*, 2021 WL 4864418, at *3; *Daniels*, 2021 WL 1222166, at *6.  *CHD*,

---

[10] *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 195-96 (Brennan, J., concurring) (state law leaving decision whether to serve any individual to unfettered discretion of private restaurants imbues private decision with state action).

[11] *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

in turn, relies on *Daniels* for the same proposition, 2021 WL 2662064, at *15, and thus its provenance traces back to the same sources.  But *Blum* and *Heineke* stand for no such rule.

The claims in *Blum* and *Heineke* were challenges to the impact of generally-applicable laws on particular individuals.  *Blum* concerned a private nursing home that participated in the Medicaid program and thus was heavily regulated by the state.  Medicaid regulations required nursing-home physicians periodically to assess the level of care patients required.  If the physicians found patients no longer needed nursing home care, the regulations required the nursing home to downgrade or discharge them.  Plaintiffs, who had been downgraded to a lower level of care, sued the state officials in charge of the Medicaid program, seeking to hold them liable for the physicians' decisions.  *Blum* held that the relevant question was not whether the nursing home was regulated, but whether the state's regulations encouraged the nursing home to downgrade the plaintiffs' care without affording due process.  The Court emphasized that the decision about the necessary level of medical care was entirely in the physician's discretion, noting, "[t]here is no suggestion that those decisions were emphasized in any degree by [the Medicaid regulations]."  457 U.S. at 1005.  Because the state did not coerce or encourage making the care decision for any particular patient, the state was not a participant in the alleged due process deprivation.  *Id*. at 1007-12.  Plaintiff in *Heineke* was a professor at a private university who was terminated for sexually harassing a student.  He claimed that the university had deprived him of due process, and had done so due to government coercion by conditioning the university's receipt of federal funds on its compliance with anti-discrimination laws.  The court held that the university did not become a state actor merely because it was subject to these general laws.  965 F.3d at 1013-14.

In both these cases, the private entity was subject to, and in turn enforced, laws or regulations that applied broadly to all similarly situated private entities—nursing homes in *Blum*, and universities in *Heineke*.  The courts in those cases could choose only between two fact patterns: either everyone affected by a regulation, or the specific result for an individual plaintiff.  The former was not enough to create state action, and neither plaintiff succeeded in showing the latter.  Neither case said that actions taken in response to government coercion aimed at an

1    identifiable group, but not identifying any group members by name, were unredressable.  The

2    courts' statements regarding "particular case" must be read as distinguishing the facts before them

3    from simply enforcing a law of general applicability.  *Daniels*, *Doe*, and *CHD* plucked these

4    unexceptionable holdings out of context and transmogrified them into a much broader, and

5    insupportable, rule—that state action can only exist where the government has compelled the

6    allegedly unlawful result in a specific plaintiff's individual case.  The fallacy of their holdings is

7    easily demonstrated by returning to the Supreme Court's civil rights decisions.

8         The infirmity of the "particular case" test adopted by *Doe*, *Daniels*, and *CHD* is evident

9    when mapping it onto, e.g., the *Lombard* facts.  In *Lombard*, no law, regulation, or municipal

10   ordinance required or encouraged segregation.  The mayor and police chief had simply made

11   speeches inveighing against sit-in protests.  If *Doe*, *Daniels*, and *CHD* correctly stated the law,

12   the courts would have been compelled to dismiss the *Lombard* case because the government

13   officials had not identified the affected individuals in their public statements.  The only difference

14   here is that the targeted speakers were identified by their political viewpoint rather than their race.

15        Neither *Blum* nor *Heineke* addressed this issue of group identification.  Because the

16   plaintiffs in those cases sued as individuals and not as members of groups, the courts did not need

17   to, and did not, consider the question of the requisite granularity of identification where

18   government action incentivized a private entity to target an identifiable group for discrimination.

19   For that reason, *Blum* and *Heineke* do not compel the result Defendants advocate here.

20        **3.    Plaintiffs Have Amply Alleged Coercive Statements by State Actors.**

21             **(a)    Defendants Improperly Urge the Court to Decide a Question of
                         Fact—Whether the Extensive Alleged Government Officials'**

22                     **Statements Amount to Coercion.**

23        Defendants argue that government officials' extensive pronouncements demanding that

24   social media platforms, including YouTube, censor then-President Trump and those who

25   supported his views do not rise to the level of coercion as a matter of law.  MTD at 10.  But this is

26   an extremely fact-intensive issue.  Statements made by public officials "require courts to draw

27   fine lines between permissible expressions of personal opinion and implied threats to employ

28   coercive state power to stifle protected speech."  *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d

1   33, 39 (2d Cir. 1983).  A court's decision whether such a statement is "sufficiently coercive" to

2   constitute state action depends on a factual judgment:  can "the comments of governmental

3   officials [] reasonably be interpreted as intimating that some form of punishment or adverse

4   regulatory action will follow failure to accede to the officials' request." *Id*.  That judgment

5   cannot be made based on a few snippets quoted out of context in Defendants' brief.  Instead, the

6   Court must consider the entirety of the Defendants' words and actions in determining whether

7   they could reasonably be interpreted as an implied threat.  *See Bantam Books,* 372 U.S. at 67

8   (court must "look through forms to the substance" to assess whether "coercion, persuasion, and

9   intimidation" by state amounted to impermissible "informal censorship"); *see also Bennett v.*

10  *Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005) (explaining that "adverse effect" in a retaliation

11  claim "depends on context").[12]  The FAC contains numerous allegations relevant to this analysis,

12  all of which eventually must be weighed to determine whether Plaintiffs have proven a First

13  Amendment claim—but not on this motion.

14              **(b)      Plaintiffs Have More Than Plausibly Alleged Coercion.**

15          The line between mere government expression and intimidation is crossed when there is

16  an "actual or threatened imposition of government power or sanction."  *American Family Ass'n v.*

17  *City of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002).  The threat need not be explicit; an

18  indirect threat suffices.  In *Bantam Books,* the Supreme Court held that state officials violated the

19  First Amendment by sending letters to booksellers warning that the sale of "objectionable" books

20  could bring legal repercussions.  It made no difference that the officials who communicated the

21  threats lacked the "power to apply formal legal sanctions."  372 U.S. at 68.  Nor did it matter that

22  the letters were framed as mere "exhort[ation]" or that booksellers were "free" to ignore them.

23  As the Court sensibly observed, "people do not lightly disregard public officers' veiled threats."

24  *Id*. at 66-68.  The coercion alleged in *Mathis*, which the Court found sufficient to invoke state

25  _____

26  [12] A number of factors bear on this inquiry, including: (1) the defendants' regulatory or other
    decision-making authority over the targeted entities; (2) the language of the allegedly threatening

27  statements; (3) allegedly retaliatory exercises of regulatory authority over the targeted entities;
    and (4) the perception of a threat by the targeted entities and their response.  *Zieper v. Metzinger*,

28  474 F.3d 60, 66 (2d Cir. 2007).

1  action, was even more diffuse.  Mathis made only "bare" allegations that he had been injured due

2  to NRC pressure on power plant operators to screen out drug users.  That was enough to tie the

3  NRC to his dismissal and preserve his *Bivens* claim.  *Mathis*, 891 F.2d at 1434.

4          There can be no doubt that a plausible inference can be drawn from Plaintiffs' allegations

5  that the public officials "deliberately set about to achieve the suppression of [speech] deemed

6  'objectionable.'"  *Bantam Books*, 372 U.S. at 68.  As detailed in the FAC, some of the most

7  powerful legislators and Executive Branch officials, with the power to make good on their threats,

8  repeatedly called for social media to undertake a coordinated campaign to quash what officials

9  deemed to be unacceptable speech or else risk repeal of their Section 230 immunity—including in

10  statements made at formal congressional hearings and from the West Wing.  Defendant Pichai

11  admitted in congressional testimony that YouTube had been "taking guidance" from government

12  officials before "proactively removing information" and agreed that YouTube would be "happy to

13  work and cooperate" with the federal government to "to better track and remove harmful content"

14  from the site."  The Biden White House's explicit call for social media companies to "ensure

15  uniformity" in banning speech further contradicts Defendants' self-serving assertions.  FAC

16  ¶¶ 144, 150.  Defendants are asking the Court to accept Defendants' version of events over

17  Plaintiffs' allegations, an argument that cannot be countenanced on this motion.  Moreover, "[t]he

18  mere fact that [a defendant] might have been willing to act without coercion makes no difference

19  if the government did coerce."[13]  *Mathis*, 891 F.2d at 1434.  Indeed, the restaurants in *Peterson,*

20  *Robinson,* and *Lombard* may have been perfectly happy to segregate; they may have appreciated

21  the government's cover for doing so.  It made no difference.  Plaintiffs have alleged far more than

22  "unadorned, the-defendant-unlawfully-harmed-me accusation[s]."  *Twombly*, 550 U.S. at 555.

23  This issue can only be resolved conclusively after evidence is introduced, not now.[14]

24  _____

25  [13] *See also Carlin*, 827 F.2d at 1295 ("[The phone company] insists that it remains an unresolved question of fact whether the county attorney's letter was the **real motivating force** behind the

26  termination.  Even if unresolved, **this factual question is immaterial.**") (emphasis added); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015) (state action exists even where

27  threatened party denies they perceived or were moved by government threat).

28  [14] Should the Court conclude that the governmental statements described in the FAC appear ambiguous, the Court is required on this motion to draw a reasonable inference of coercion in

### (c)    Defendants Misstate the Legal Standard for Coercion.

Defendants assert that "compulsion" requires a "regulation or custom having the force of law," citing *Johnson v. Knowles*, 113 F.3d 1114 (9th Cir. 1997).  MTD at 8.  That misstates the law.  Were Defendants correct, no state action could have existed in *Robinson*, *Lombard*, *Mathis*, *Davis*, or *Ross*.  Nor does *Johnson* stand for that proposition.  The plaintiffs there had been removed from a political party's central committee (a private entity), allegedly due to homophobia.  The narrow issue before the court was whether a state law that allowed the committee to remove members who supported another party's candidate was, *by itself*, sufficient to transform the private committee's conduct into state action.  The court said no, because the allegedly coercive statute was not a "regulation or custom" that "compelled, coerced, or encouraged the Defendants to discriminate against the [p]laintiffs."  *Id.* at 1120.  The court did not purport to announce any broader state action rule, nor has the Supreme Court ever announced a "force of law" requirement for the compulsion theory to apply.  Defendants also claim that, because *Carlin* involved a threat to bring criminal charges, only a threat of criminal prosecution rises to the level of "coercion" for purposes of state action.  MTD at 10-11.  That generalized rule appears nowhere in the case.  The court held only that "with this threat, Arizona 'exercised coercive power' over [the phone company] and thereby converted its otherwise private conduct into state action."  827 F.2d at 1295.[15]

### 4.    Threats by Individual Officials Suffice to Create State Action.

Defendants argue that Plaintiffs' First Amendment claim must be dismissed because government officials were not speaking on behalf of Congress or the Executive Branch when they called for then-President Trump and those who supported his views to be censored.  MTD at 9.  On the contrary, the bulk of the statements identified in the FAC were made *ex cathedra*—on the

---

(… cont'd)
Plaintiffs' favor.  *See Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003), cited with approval in *Brodheim v. Cry*, 584 F.3d 1262, 1279 (9th Cir. 2009).

[15] Defendants' misuse of *Johnson* and *Carlin* are two examples of a larger pattern, whereby Defendants cite to a holding that is specific to the facts before that court, and inflate it to purportedly stand for a broader rule of general applicability.

floor of Congress or from the White House.  Even if that were not the case, however, what

Plaintiffs have alleged is enough.  Informal conduct by state actors can give rise to state action.

*See, e.g., Lombard* (speeches by public officials).  Not even the fact that the actions of the state

agents are *illegal* precludes them from being attributable to the state for purposes of the

Fourteenth Amendment.  "Misuse of power, possessed by virtue of state law and made possible

only because the wrongdoer is clothed with the authority of state law, is action taken 'under color

of' state law." *United States v. Classic*, 313 U.S. 299, 326 (1941).  *See also Iowa-Des Moines*

*Nat'l Bank v. Bennett*, 284 U.S. 239, 246 (1931) ("[A]cts done 'by virtue of public position under

a State government . . . and . . . in the name and for the State' . . . are not to be treated as if they

were the acts of private individuals, although in doing them the official acted contrary to an

express command of the state law.") (Brandeis, J.).  Justice Frankfurter put this canard to rest:

> The State, in these situations, must mean … those clothed with the authority and the
> influence which official position affords. … This phrase [state action] gives rise to a false
> direction in that it implies some impressive machinery or deliberative conduct normally
> associated with what orators call a sovereign state.  The vital requirement is State
> responsibility—**that somewhere, somehow, to some extent, there be an infusion of
> conduct by officials, panoplied with State power, into any scheme [to deny protected
> rights]**.

*Terry v. Adams*, 345 U.S. 461, 473 (1952) (concurring) (emphasis added).  If even misuse or

unlawful use of state power by those clothed with state authority can be state action, then official

action clothed in the formal trappings of a congressional hearing or a White House press briefing

is surely sufficient.

Defendants cite to *Abu-Jamal v. Nat'l Public Radio*, 1997 WL 527349 (D.D.C. Aug. 21,

1997), *aff'd*, 159 F.3d 635 (D.C. Cir. 1998), to support their position that a statement by an

individual government official can *never* amount to state action.  MTD at 9-10.  Once again,

Defendants have taken fact-specific holdings and attempted to stretch them, like Gumby, into

general principles unsupported by the holdings.  In *Abu-Jamal*, the Fraternal Order of Police

publicly denounced NPR's decision to air "commentaries" written by the plaintiff, a convicted

cop-killer.  The late Senator Robert Dole contacted NPR demanding that it not play Abu-Jamal's

pieces, which NPR ultimately pulled.  And in *Daniels*, the asserted basis for state action consisted

of two letters from Congressman Adam Schiff and one comment from House Speaker Nancy Pelosi, describing Section 230 immunity as a "gift" that "could be removed." These statements bear scant resemblance to the multiple pointed threats levied at Defendants at congressional hearings, specifically convened for the purpose of pressuring social media companies to censor disfavored speech: "**Congress will have to compel you, compel you perhaps with penalties, to make meaningful changes**." *See supra* at 4. The district courts' holdings in *Abu-Jamal* and *Daniels* do not stand for a general proposition that "public statements by individual legislators cannot transform private parties into state actors," MTD at 9, and if they did, they would be in direct conflict with binding Supreme Court precedent in *Lombard*, *Classic*, *Iowa-Des Moines Nat'l Bank*, and *Terry*.

### 5. Plaintiffs Have Pleaded the "Something More" Needed to Maintain a Claim Against a Private Party.

Defendants claim that the compulsion theory is available only when the government itself is a defendant. MTD at 11-12 (citing *Sutton*). This argument misses the mark by a country mile. It is true that, in order to hold a private party, rather than the government, liable, a plaintiff must show "something more." But *Sutton* held that the "something more" required to hold a private party liable could be any of four fact patterns, including *governmental compulsion or coercion*, and *joint action*. These are precisely the categories of "something more" that Plaintiffs have alleged and will prove. *See id*. at 835 (other two categories are "public function" and "governmental nexus"); *accord Lugar*, 457 U.S. at 938-39.

### E. Section 230(c) Itself Provides Government Encouragement of Defendants' Conduct.

Private conduct also becomes state action when the government provides significant encouragement, either overt or covert, to the private party's initiatives. *Blum*, 457 U.S. at 1004. The above-described official statements not only amount to coercion, they also provide "significant encouragement." Defendant Pichai has admitted that YouTube's censorship "is possible only because of …Section 230."[16] As such, the state has taken affirmative steps

---

[16] FAC ¶ 71; March 2021 Hearing. (Testimony of Sundar Pichai) (Tr. at 35:775-77, 780-83); RJN

designed to make censorship of protected speech legally possible—indeed, risk-free. Thus, the ultimate impact of the statute has been to "encourage and significantly involve the State in private [viewpoint based] discrimination." *Reitman*, 387 U.S. at 376. Read as a whole "without tightly compartmentalizing the various factual components," *Cont'l Ore.*, 370 U.S. at 699, these allegations plead encouragement.

### 1.    State Action Can Consist of Enabling Discriminatory Private Conduct.

Defendants argue that Section 230 has no impact on the state action analysis because it does not compel parties to take any action. MTD at 14-17. But the state "acts" not only when it coerces, but also when it permits. In *Reitman*, California voters passed an amendment to the California Constitution prohibiting the state from enacting laws forbidding racial discrimination in private housing. The amendment left private actors free to discriminate without fear of legal consequences. In the Court's words, "[t]he right to discriminate is now one of the basic policies of the State." 387 U.S. at 381. Plaintiffs, who had been denied housing on account of their race, sued the property owners, who cited the constitutional amendment as a defense. The Supreme Court acknowledged that the amendment on its face, and thus the state, had done nothing to encourage the discrimination. But, by making private discriminatory practices immune from the legislative process, the amendment impermissibly encouraged private racial discrimination and thus violated the Equal Protection Clause. *Id*. In just the same way, Section 230's grant of immunity impermissibly encourages social media platforms to block disfavored speech, free not merely from official restraint, but private lawsuits as well.

The Supreme Court also has held that federal laws which, like Section 230, immunized private conduct from liability, convert such conduct into state action. In *Railway Employees' Dept. v. Hanson*, 351 U.S. 225, 232 (1956), the Court found state action in private employers' union shop agreements because, under a federal statute, such agreements could not be "made illegal" by any state law. Like Section 230, the federal law was permissive; it did not compel

---

(… cont'd)

¶ 2. (Defendants "removed 850,000 videos … Our ability to …remove this information is possible only because of legal frameworks like Section 230.")

1   employers to enter into union shop agreements; it only prohibited states from banning them.  And

2   in *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), the Court found state action

3   in employee drug testing conducted by private employers after the federal government enacted

4   regulations immunizing the employers from liability for performing such tests.  Once again, these

5   regulations did not compel the testing, but merely immunized it from private lawsuits—just like

6   Section 230.  *Id*. at 611.  The regulations infused private employer's conduct with state action

7   because the regulations "removed all legal barriers" to such testing and thus provided "clear

8   indices of the Government's encouragement, endorsement, and participation" in the practice.  *Id*.

9   at 615-16.  Similarly, Section 230(c) removed all legal barriers to Defendants' censorship and

10   thus is one of several "clear indices of the Government's encouragement" of such censorship.

11          In attempting to distinguish away the Supreme Court's decisions in *Hansen* and *Skinner*,

12   Defendants have misread or misrepresented those cases.  MTD at 15-16.  In *Skinner*, the Federal

13   Railroad Administration had promulgated regulations addressing the problem of alcohol and

14   drugs on the railroads.  Subpart C mandated toxicological testing following a "major train

15   accident."  However, Subpart C was not at issue.  Petitioners' claim pertained to voluntary testing

16   conducted under *Subpart D of* the regulations: "Petitioners contend, however, that the Fourth

17   Amendment is not implicated by Subpart D of the regulations, as nothing in Subpart D compels

18   any testing by private railroads."  *Id*. at 614.  The Supreme Court disagreed:

19          We are unwilling to conclude …that breath and urine tests **required by private railroads
20          in reliance on Subpart D** will not implicate the Fourth Amendment. … The fact that the
            Government has not compelled a private party to perform a search does not, by itself,
21          establish that the search is a private one.

22   *Id*. at 614-15 (emphasis added).  Defendants' reasoning for why this Court should ignore *Hansen*

23   is even thinner gruel.  *Hansen* is "far afield," they say, because (i) it was not a First Amendment

24   case, and (ii) it arose in the context of labor relations.  MTD at 16.  *Peterson*, *Robinson*, and

25   *Lombard* also were not First Amendment cases, making the response to Defendants' first

26   argument, "so what"?  And, so far as Plaintiffs are aware, there is no special category for "state

27   action involving labor laws" that might serve to distinguish *Hansen*.

28

### 2.      The State Also "Acts" When It Allocates Property Rights.

The state actions here that met the "encouragement" test also can be understood as re-allocating property rights.  Prior to passage of the California constitutional amendment in *Reitman*, fair housing laws had granted the public the right to access housing without regard to race.  The amendment stripped the public of that right and, instead, granted property owners the power to refuse housing because of race—a right the prior law had denied them.  Either there was a duty not to discriminate in the housing market on the basis of race, or there was no duty.  In *Hanson*, railways and employees either had the "right to work" without joining a union, or they did not.  In *Skinner*, employees either were free from private drug testing, or were not.  And under Section 230, private parties either retain their common law and statutory rights to sue social media companies, or they do not.  Affirmatively granting private parties the freedom to deny housing, maintain a union shop, drug test employees, or censor otherwise protected speech involves the state in diminishing the other party's rights.  When the state takes overt action to allocate those rights among private parties, it necessarily encourages the kind of conduct that its action favors.  Indeed, there would be no point in re-allocating such rights if the government did not expect private parties to act in accordance with the new allocation.

Under Section 230, Defendants are free to engage in invidious discrimination and the state has granted them the right to do so free from liability; the state is delegating to them the power to choke off speech the state disfavors.  Telling a class of speakers that they have no legal recourse if the social media platforms do not wish to treat them as equal citizens puts the coercive power of the state squarely on the side of viewpoint-based exclusion.  State action is always present when the state acts through the legal system to allocate property rights, and private actors violate the Constitution when the state allocates property rights so as to allow them to discriminate without fear of legal repercussions.

### 3.      Defendants' Other Citations Are Inapposite.

Defendants argue that the courts have rejected the notion that Section 230 contributes to government "encouragement" of their activities sufficiently to create state action.  MTD at 14-17.  Their cited cases are inapposite and, more importantly, cannot trump the Supreme Court

authorities discussed above.  In *Divino*, 2021 WL 51715 at *5, the court rejected a similar Section 230 argument, in part on the ground that plaintiffs could not challenge a federal law under Section 1983.  The court further held that state action might exist "when the government compels the private entity to take a particular action," citing *Blum*, and found no state action on the facts presented because "nothing about Section 230 is **coercive**."  *Id.* at *6 (emphasis added).  The court overlooked the "encouragement" portion of the state action test.  *Atkinson v. Meta Platforms*, 2021 WL 5447022 (9th Cir. Nov. 22, 2021), is even further afield.  The Court upheld dismissal because, again, plaintiff had pleaded an improper Section 1983 claim challenging a federal law, and had not adequately pleaded federal coercion or joint action.  That decision does not even mention the word "encourage."   Finally, plaintiffs in *Roberts v. AT&T Mobility LLC*, 877 F.3d 833 (9th Cir. 2017) sought to find state action in the mere existence of the Federal Arbitration Act, claiming that the statute "'encourages arbitration' such that AT&T's actions are attributable to the state." *Id*. at 836.  "This stretches the encouragement test too far," said the court.  The agreement to arbitrate was reached by private contract and "there is no state action simply because the state enforces that private agreement."  *Id.* at 844.  Here, by contrast, Section 230 does far more; it insulates Defendants from liability for engaging in discriminatory content censorship.  Given the widely disparate facts alleged here, it is hardly true that allowing Plaintiffs' claim to proceed would be "directly contrary to" *Roberts*.

**F.     Joint Action Also Is Sufficiently Pleaded**

A private entity acts under color of state law if it is "a willful participant in joint action with the state or its agents."  *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989).  The joint action test asks "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012).  The test is satisfied by an "agreement" or "understanding" between the private party and government officials to accomplish a common objective.  *See*, *e.g.*, *Adickes*, 398 U.S. at 158-59 (tacit "understanding" between restaurant worker and police officer sufficient to create state action).  "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence…."  *Mendocino Env. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301 (9th

Cir. 1999).  Whether defendants were involved in such an agreement "is generally a factual issue and should be resolved by the jury, 'so long as there is a possibility that the jury can "infer from the circumstances" that [defendants] …reached an understanding' to achieve [their unlawful] objectives." *Id*. at 1301-02.

Plaintiffs' allegations are more than enough to plead joint action under these standards. The record is replete with facts from which a jury could infer a common understanding between the government and Defendants to censor President Trump and those who echoed his views on election fraud and/or COVID-19.  Defendant Pichai admitted in congressional testimony that Defendants took "guidance" from government officials before removing information from their platform.  He further agreed that YouTube would be "happy to work and cooperate" with the federal government to "track and remove harmful content" from the site.  The government, for its part, overtly incentivized social media to coordinate the censorship of disfavored speech.  And the White House admitted that social media platforms respond to political pressure by ramping up their "enforcement" efforts.  These allegations would survive a Rule 12(b)(6) challenge even under the more rigorous standard applied to antitrust conspiracy claims. *Twombly*, 550 U.S. at 556.

Defendants once again utilize their "Gumby" strategy by overgeneralizing the holding in *Pasadena Republican Club v. W. Justice Ctr.*, 985 F.3d 1161 (9th Cir. 2021).  That case does not hold that finding of joint action *requires* a showing of "significant financial integration between the private party and the government."  MTD at 13-14.  *Pasadena* addressed whether state action could be found based on the existence of a property lease agreement between a governmental entity, as lessor, and a private party, as lessee.  In that specific context, *Pasadena* states that "substantial coordination" and "significant financial integration" between the private party and government are hallmarks of a "symbiotic relationship," citing *Brunette v. Humane Society of Ventura County*, 294 F.3d. 1205 (9th Cir. 2002).  *Brunette*, in turn, held only financial integration was *one factor* that could contribute to a finding of joint action: "**Often** significant financial integration **indicates a symbiotic relationship**." *Id*. (emphasis added).

**G.     Plaintiffs Have Standing to Challenge the Constitutionality of Section 230.**

Defendants argue that (i) Plaintiffs lack standing to claim that Section 230 is unconstitutional, and (ii) the statute is not unconstitutional.  MTD at 12-13.  The second argument raises a purely merits issue that should not be adjudicated on an undeveloped record.  As to the first, Plaintiffs have standing to challenge Section 230 because Defendants have raised Section 230 as a ground for dismissing Plaintiffs' state law claims.  The fact that the Court has not yet ruled on this defense does not preclude challenging it as unconstitutional.  The Supreme Court has held that a "preenforcement, as-applied challenge" to a statute can be maintained.  *Gonzales v. Carhart*, 550 U.S. 124, 167 (2007).  Standing exists because, in this "discrete and well-defined instance[] a particular condition has [occurred] or is likely to occur."  *Id*.  The "particular condition" here is that Defendants have raised their Section 230 immunity as a shield from liability.  To the extent that the immunity is unconstitutional in this application, the issue has been joined and must be decided.  As applied, Section 230 would deprive Plaintiffs their right to access the courts to pursue their right to hold Defendants responsible under state laws.  Plaintiffs will suffer "a concrete and particularized injury" that is "traceable to the conduct they challenge," and that "would likely be redressed by a favorable decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Plaintiffs thus have standing to challenge Section 230's unconstitutionality.

The decision in *Lewis v. Google LLC*, 461 F.Supp.3d 938 (N.D. Cal. 2020), does not compel a different result.  MTD at 17.  On the contrary, it supports Plaintiffs' position.  The court in that case considered the merits of Lewis's claim challenging the constitutionality of Section 230 for precisely the same reason as exists here: "[T]he Court will address Plaintiff's argument raised in his third claim [Section 230 unconstitutionality] **because Defendants assert this statute as a ground for dismissing Plaintiff's claims**."  *Id*. at 952 (emphasis added).[17]

Section 230 immunity confers an immensely valuable benefit on Defendants, with

---

[17] Lewis's claim bears no resemblance to the facts pleaded here.  Lewis had alleged that Section 230 is unconstitutional "because the statute doesn't define any of the terms included under §[230](c)(2)(A), such as: 'harassing, obscene, lewd, lascivious, filthy, excessively violent, objectionable,'" *Lewis*, 461 F.Supp.3d at 952.  The court found that this was not a sufficient allegation to support his First Amendment claim.  *Id*. at 953.

concomitant harm to Plaintiffs.  As the congressional hearings cited above vividly demonstrate, legislators overtly reference the existence of Section 230 immunity, and their power to strip social media of its protection, to enforce their agenda.  The government's repeated threats to repeal the immunity if social media companies don't toe the line is a sword overhanging Defendants' heads, and the weapon government wields to enforce their compliance.  The statute affords the government leverage to promulgate viewpoint discrimination via its social media partners. Plaintiffs also have standing to challenge Section 230 because the prospect of repeal has been explicitly used by state actors as a mechanism to coerce censorship of Plaintiffs' speech. Defendants' ban of former President Trump and speakers who support his views will remain in place so long as Section 230 remains as a cudgel government actors can use to menace social media companies.  That is sufficient causation and injury to confer standing on Plaintiffs to bring this claim.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Finally, the Court's disposition of this claim does not depend on how it is characterized in the pleading:

> [T]he effect of a given case is a function not of the plaintiff's characterization of his challenge, but the narrowness or breadth of the ground that the Court relies upon in disposing of it.  If a plaintiff elects not to present any case-specific facts in support of a claim that a law is unconstitutional—as is the case here—he will limit the grounds on which a Court may find for him to highly abstract rules that would have broad application in future cases. … But even had the plaintiffs in this case presented voluminous facts … nothing would force this Court to rely upon those facts rather than the broader principle that the Court has chosen to rely upon.  **I see no reason why a plaintiff's self-description of his challenge as facial would provide an independent reason to reject it unless we were to delegate to litigants our duty to say what the law is.**

*City of Los Angeles v. Patel*, 576 U.S. 409, 430 (2015) (Scalia, J., dissenting) (explaining that, where plaintiff raised facial claim, Court could have decided "as-applied" constitutional challenge had plaintiff presented "case-specific facts").  Based on the "voluminous" facts alleged, Plaintiffs have made out, at the least, a viable as-applied claim.

### H.    Plaintiffs' Claims Under Florida Law Are Viable.

#### 1.    The Choice-of-Law Provision Does Not Foreclose the FDUTPA Claim.

The Defendants suggest that, in granting their motion to transfer this case from Florida to

1    this Court, the Florida court decided that applying the choice-of-law provision would contravene

2    public policy.  MTD at 19.  That is incorrect.  Defendants' briefing on the motion to transfer and

3    the Florida court's order all specifically state that Florida law could be applied just as easily by

4    this Court as by the Southern District.  *See* Def.'s Mot. to Transfer at 17 (Dkt. 64); Def's Reply at

5    9 (Dkt. 68); Transfer Order at 17 (Dkt. 70).  The choice of law issue remains unresolved.

6        A choice-of-law provision will not be enforced when it is contrary to the fundamental

7    policy of another state.  Thus enforcement of the choice-of-law provision does not depend on

8    YouTube's Terms of Service ("TOS"), but on whether Florida's fundamental policy is at odds

9    with California's.  Florida policy, as expressed in FDUTPA, allows a plaintiff to seek injunctive

10   relief without showing financial injury.  Fla. Stat. § 501.211(a) (2021); *Ahern v. Mayo Clinic*, 180

11   So.3d 165, 172 (Fla. 1st DCA 2015).  California's Unfair Competition Law ("UCL") limits

12   standing; a plaintiff must show that he "has lost money . . . as a result of the unfair competition."

13   Cal. Bus. & Prof. Code §§ 17204 *et seq*.  As the UCL's narrower standing requirements

14   undermine Florida's policy, which allows any aggrieved person to seek injunctive relief,

15   enforcement of the choice-of-law provision would undermine Florida's policy and should

16   therefore be rejected.[18]  As the court noted in an analogous context in *In re Facebook Biometric*

17   *Information Privacy Litig.*, 185 F.Supp.3d 1155, 1170 (N.D. Cal. 2016), Florida "will suffer a

18   complete negation of its [FDUTPA policy] for its citizens if California law is applied."[19]

19       **2.    Defendants' Failure to Disclose Material Information Is Actionable.**

20       Defendants have violated their own TOS and deceived users by failing to disclose that

21   they put a "thumb on the scale" by making content removal decisions in order to placate

22   government officials.  FAC ¶¶ 272-73, 275, 279.  This failure to disclose is a material omission

23   

---

24   [18] To the extent Defendants' motion concedes that Plaintiffs have standing under the UCL,
     Plaintiffs have pleaded a UCL claim for injunctive relief for deceptive omissions.  *See Lavigne v.*

25   *Herbalife, Ltd.* 2019 WL 6721619, at *11 (C.D. Cal. Oct. 22, 2019) ("Where California and not
     Florida law applies … the court may consider the [FDUTPA] claim ... under [the UCL]").

26   [19] Defendants cite *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1056 (N.D. Cal. 2018)  for
     the proposition that "differences in the particulars" of consumer statutes are not enough to avoid a

27   choice-of-law provision.  In *Williams*, the relevant "particular" was the availability of $50 in
     statutory damages, which is qualitatively different from the ready availability of injunctive relief

28   to plaintiffs who would have no remedy under the UCL.

1    under FDUTPA.  In *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*,

2    169 So. 3d 164, 167 (Fla. 4th DCA 2015), plaintiff alleged that the local BBB chapter posted

3    deceptive information to its website about the criteria used to grade businesses.  The court held

4    that this allegation properly established a deception by omission claim under FDUTPA.

5    YouTube has publicly stated its standards for removing content.  FAC ¶ ¶ 39-40, 97, 110-128.

6    Nevertheless, the FAC is replete with references to content from favored speakers which violates

7    these standards, and yet is maintained on YouTube's platform.  Defendants claim that their TOS

8    give them unlimited flexibility in enforcing their announced standards for moderation.  Such an

9    interpretation would render the TOS a nullity.  It also demonstrates that the moderation standard

10   is the whim of Defendants, not their announced standards, in violation of FDUTPA.  Defendants'

11   arguments regarding injury reveal their misunderstanding of the statute.  A plaintiff need only

12   show he has been upset by "perceived unfair treatment" to obtain injunctive relief.  *Ahearn*, 180

13   So.3d at 172-73.  Plaintiffs have been aggrieved in that they expected Defendants' platform to

14   apply their stated policies, and not to block only disfavored political views.  FAC ¶¶ 3, 11, 274,

15   277, 281.  Had Plaintiffs and other users known that Defendants' "standard" for moderation was

16   political, they would not have engaged with the platform.[20]

17                     **3.      Plaintiffs' Allegations Under the SSMCA Are Sufficient.**

18          Florida's Stop Social Media Censorship Act ("SSMCA") requires subject companies to

19   publish the standards by which they censor, deplatform, or shadow ban a user, and to apply their

20   standards *in a consistent manner*.  Fla. Stat. § 501.2041(2)(a) & (b) (2021).  Plaintiffs are not

21   limited to challenging actions taken with respect to their own channels.  A plaintiff under the

22   SSMCA needs only to be a user of the service, not the party affected by the inconsistent

23   treatment.  Accordingly Plaintiffs' claims are not necessarily based on Defendants' treatment of

24   them, but on Defendants' failure to consistently apply their standards after the statute's effective

25

26   ───────────────

27   [20] Defendants incorrectly claim that FDUTPA would require perfect uniformity and consistency in applying their TOS.  Count III is not based on a failure to apply the TOS in any particular manner; it is based on Defendants' failure to disclose a material aspect of the TOS—political

28   favoritism in making content removal decisions.

PLAINTIFFS' OPP. TO MOT. TO DISMISS &
REPLY ISO MOTION FOR PRELIMINARY INJUNCTION—27          Case No: 4:21-cv-08009-JSW

1    date.   FAC ¶¶ 294-296; Fla. Stat. § 501.2041(2)(a) & (b) (2021).

2        **4.    Constitutional Issues**

3        **First Amendment Challenge:**  The SSMCA does not impose any requirement regarding

4    the content Defendants may "moderate"; it merely requires disclosure and consistency if they do

5    so.  Defendants' suggestion that this is a content-based regulation overlooks the fact that the only

6    regulations at issue are a platform's *own* standards.  Provisions similar to the SSMCA's

7    disclosure requirements, designed to combat deceptive practices, have long been held to be

8    consistent with First Amendment protections.  *See Central Hudson v. Public Service Comm'n*,

9    447 U.S. 557, 563 (1980) ("The government may ban forms of communication more likely to

10   deceive the public than to inform it…."); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S.

11   626, 650-651 (1985) (same).

12       Defendants cite *NetChoice v. Moody*, 2021 WL 2690876 (N.D. Fla. June 30, 2021) to

13   support their attack on the constitutionality of the SSMCA.  But the *NetChoice* court entered a

14   preliminary injunction; it made no ruling on the merits of the plaintiff's First Amendment claims.

15   Moreover, *NetChoice* addressed a host of SSMCA provisions which are not applicable here.

16   Defendants further assert that under *Miami Herald v. Tornillo*, 418 U.S. 241 (1974) they are

17   authorized to moderate content as they see fit.  Their reliance on *Tornillo* is misplaced.

18   Defendants are not like a newspaper, and the SSMCA provision before this Court does not

19   impose any First Amendment burdens on the Defendants.  In *Tornillo*, a Florida law required

20   newspapers to provide space for a right of reply from public officials who had been criticized in

21   the *Miami Herald*.  The Court held that the law impinged on the newspaper's First Amendment

22   rights because the *Herald* would have to devote space to and incur costs for publishing a reply;

23   the law would have a chilling effect on what the *Herald* published; and the law intruded on the

24   newspaper's editorial control over the material that appeared in its pages.  *Id*. at 256-58.  These

25   factors do not apply to Defendants' platform.  In an electronic medium, space and the cost of

26   paper are not issues.  Defendants cannot, and do not, claim that among the roughly 500 hours of

27   video uploaded *every minute* by third parties, YouTube is exercising editorial control over a

28   message.  The *NetChoice* court recognized exactly this distinction:

1

2

3

4

> But newspapers, unlike social-media providers, create or select all their content, including op-eds and letters to the editor. …[A] newspaper is not a medium invisible to the provider. …Social media providers, in contrast, routinely use algorithms to screen all content for unacceptable material but usually not for viewpoint, and the overwhelming majority of the material never gets reviewed except by algorithms.  The content on a site is, to that extent, invisible to the provider.

5

6

7

2021 WL 2690876, at *8.  *See also Rumsfeld v. FAIR*, 547 U.S. 47 (2006) and *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) (establishing that compelling property owner to allow visitors access for the purpose of speaking is not a First Amendment violation).[21]

8

9

10

11

12

13

14

15

16

17

18

19

The proper analogy for Defendants' platform is not a newspaper, but a railroad or telephone company.  Like all common carriers, Defendants do not engage in individualized decisions whether and on what terms to deal.  *U.S. Telecom Ass'n v. FCC* 825 F.3d 674, 740 (D.C. Cir. 2016).  Defendants are engaged in "quasi-public" functions like common carriers because, when they solicit and host third party content, they do so clothed in Congressionally authorized immunity, worth billions annually.  47 U.S.C. § 230(a)(1), (a)(3), (b)(1). Congressional gifts of this magnitude were used by courts to hold that railroads are common carriers.  Moreover, whether a party is conveying speech or physical goods is immaterial to common carrier analysis.  *U.S. Telecom,* 825 F.3d at 742; *accord*, *FTC v. AT&T Mobility, LLC*, 883 F.3d 848, 860 (9th Cir. 2017).  Defendants' TOS are no different than a common carrier's prohibitions on certain types of cargo.  *Conservation Force v. Delta Air Lines, Inc.* 190 F.Supp.3d 606 (N.D. Tex. 2016).

20

21

22

23

24

25

**Vagueness:**  Defendants assert the phrase "consistent manner" is unconstitutionally vague.  The standard required of any statute is fair notice as to what may run afoul of the law. *Winters v. New York*, 333 U.S. 507, 524 (1948) (Frankfurter, J., dissenting).  The phrase "consistent manner" is contained in the Florida law, Fla. Stat. § 501.2041(2)(b) (2021), and violation of this provision is an unfair and deceptive act pursuant to FDUTPA.  Patterned on the Federal Trade Commission Act ("FTCA"), FDUTPA's standards for unfair and deceptive

26

27

28

---

[21] Any concern that a user might attribute some portion of that content as representative of the Defendants' opinions could be addressed by affixing a disclaimer to the content.  *See Prager*, 951 F.3d at 997.

1   conduct incorporate the body of federal case law applying the FTCA.  In the federal context, the

2   concept of "unfairness"—certainly no less "vague" than "consistent"—has survived constitutional

3   scrutiny for more than a century.  *Fed. Trade Comm'n v. Gratz*, 253 U.S. 421 (1920).  Defendants

4   also cite *NetChoice* to support this argument, but that decision did not rule on the vagueness

5   issue.  In fact, while observing that the SSMCA contains "imprecision and ambiguity," the court

6   held that, "this, without more, does not render the statute unconstitutional" and expressly stated

7   that it did "not decide whether vagueness would provide an independent ground for a preliminary

8   injunction."  2021 WL 2690876, at *11.  Defendants' claims of vagueness should be disregarded.

9     **Commerce Clause:**  Defendants' dormant Commerce Clause arguments similarly fail, as

10  the SSMCA's requirements are consistent with other state laws regulating how companies located

11  outside a state are required to act *within* the state's jurisdiction.  *See, e.g.*, *Grocery Mfrs. Ass'n v.

12  Sorrell*, 102 F.Supp.3d 583 (D. Vt. 2015) (law upheld requiring labels of food products); *Nat'l

13  Fed'n of the Blind v. Target Corp.*, 452  F.Supp.2d 946 (N.D. Cal. 2006) (upholding law

14  requiring websites to comply with state laws regarding disabled access).  Any constitutional

15  infirmity related to other provisions is immaterial as there is a severability clause contained

16  within the SSMCA's enacting statute.  Florida Senate Bill 7072, Section 6.

17    **5.  Section 230(c)(1) Does Not Bar Plaintiffs' State Law Claims.**

18    Defendants move to dismiss the Florida state law claims under Section 230(c)(1), which

19  purportedly immunizes Defendants from liability for information originating with a third-party

20  user.  *Fyk v. Facebook, Inc.*, 2019 WL 11288576, at *1 (N.D. Cal. June 18, 2019).  In order for

21  that immunity to apply, Plaintiffs must seek to hold Defendants liable for "information provided

22  by another information content provider," and as the "publisher[s] or [speakers]" of that

23  information.  *Id*. at *2.  Neither condition is met here.  As explained above, the Florida laws are

24  content-neutral; they do not purport to prescribe what content should or should not appear on the

25  platform.  Plaintiffs' claims are based on Defendants' failure to disclose the standards they apply

26  in deciding whether to remove content from their platform (FDUTPA) and to apply their

27  standards consistently (SSMCA).  Nothing in these claims attempts to base liability on

28  information provided by a third-party user, nor do they involve "the reviewing, editing, and

1    deciding whether to publish" third-party content. *Fyk*, 2019 WL 11288576, at *2. Defendants'

2    challenged actions cannot "be boiled down to deciding whether to exclude material that third

3    parties seek to post online," which is the *sine qua non* of Section 230 immunity. *Id*.

4    **I.       Defendant Pichai Is Properly Before This Court.**

5            An officer may be liable for corporate practices that violate FDUTPA if he or she knew or

6    should have known of the act and had the authority to control it. *KC Leisure, Inc., v. Haber*, 972

7    So.2d 1069 (Fla. 5th DCA 2008). The FAC sufficiently alleges Mr. Pichai's knowledge and

8    authority to control Defendant YouTube's activities. FAC ¶¶ 28, 47, 71, 253-54.[22] These

9    allegations are more than sufficient to support the claims against Mr. Pichai.

10   **IV.    REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

11           By banning former President Trump from the YouTube platform, Defendants have

12   prevented the free and open exchange of ideas that underpin our democracy and damaged the

13   integrity of the election process. The proposed preliminary injunction does not ask the Court to

14   impose new duties on Defendants. Rather, it simply seeks to restore *ex ante* Mr. Trump's access

15   to the account under the same terms of service that he had maintained prior to his deplatforming

16   by Defendants, who acted pursuant to express directions from the legislators and the Executive

17   Branch. The test to be applied on this motion is whether (i) Mr. Trump is likely to succeed on the

18   merits; (ii) he is likely to suffer irreparable harm in the absence of preliminary relief; (iii) the

19   balance of equities tips in his favor; and (iv) an injunction is in the public interest. *Winter v.*

20   *Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). Mr. Trump satisfies each of these

21   tests, thus entitling him to the injunctive relief requested.

22   **A.       Likelihood of Success on the Merits**

23           The most powerful public officials and entities in the Executive Branch (President, Vice

24   President, Department of Justice as Government Intervener, the CDC) as well as those in the

25   Legislative Branch (House Speaker, Committee Chairs, and Committee members) acted in virtual

26

27   [22] For example, at the March 25, 2021 hearing alone, Defendant Pichai testified at length about
     his knowledge, involvement, and control over YouTube's removal, banning, and content
28   moderation policies. FAC ¶¶ 71; RJN ¶ 2.

1  lockstep to coerce, encourage, and/or act with Defendants to ban Plaintiff from his YouTube

2  channels.  The allegations in the First Amended Complaint are sufficient to convert YouTube's

3  prior restraint of Plaintiff and his political views to state action.  *See* Opposition to Defendant's

4  Motion to Dismiss, *supra*.

5          **B.**    **Irreparable Harm**

6       Prior restraints on speech present some of the "most serious and the least tolerable

7  infringement" on free speech rights.  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

8  Plaintiffs seek a preliminary injunction to remedy a prior restraint that is *per se* irreparably

9  harmful.  *Elrod*, 427 U.S. at 373 (prior restraint "unquestionably constitutes irreparable injury").

10  *See also Backpage.com, LLC v. Dart*, 807 F.3d 229, 239 (7th Cir. 2015) (threat by public officials

11  to ban speech "unquestionably constitutes irreparable injury").

12       Plaintiff's injuries accumulate daily, with a prior restraint of his views on politics, the

13  economy, the border, national security, health, election integrity, and a host of other matters of

14  national interest.  In addition, Defendants' censorship causes him to lose opportunities to cultivate

15  political capital.  Plaintiff's injuries are not only ongoing, but exacerbated, as they flow from the

16  silencing of Plaintiff's political speech as the presumptive head of the Republican Party at a time

17  when the nation is drawing ever closer to the 2022 elections, including his endorsement of, and

18  fundraising for, candidates in primary races that are currently commencing throughout the nation.

19  Plaintiff's personal campaigning and fundraising are his means of accumulating personal political

20  capital while weighing another run for the presidency.  The existence of purported alternative

21  platforms for Plaintiff's speech is irrelevant, particularly when the few available alternatives lack

22  the Defendants' market penetration.  As the Supreme Court recently held,

23       It changes nothing that these platforms are not the sole means for distributing speech or
24       information.  A person always could choose to avoid the toll bridge or train and instead
     swim the Charles River or hike the Oregon Trail.  But in assessing whether a company
25       exercises substantial market power, what matters is whether the alternatives are
     comparable.  For many of today's digital platforms [such as YouTube], nothing is."
26

27  *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1225 (2021).

28       The proposed Preliminary Injunction causes no harm to Defendants.  They claim that "the

1   proposed injunction would require YouTube to subsidize Plaintiff's speech by giving him a free

2   platform to disseminate his speech with YouTube footing the costs of storing and transmitting

3   that content," and that "…no person in this country should be compelled to subsidize speech for a

4   third party."  MTD at 34-35.  Yet Defendants undertake the cost of hosting, storing, and

5   disseminating the content posted on its platform for all its users.  Veitch Decl. ¶ 17.  With 500

6   hours of video uploaded to YouTube every minute, and 1.3 billion users, FAC ¶¶ 86-87, any cost

7   Defendants incur to restore Plaintiff's access to his prior channels would be *de minimus* at most.

8        Defendants also argue that Mr. Trump was dilatory in pursuing preliminary injunctive

9   relief.  MTD at 33.  Defendants ignore the fact that a great part of the delay from initiation of this

10  lawsuit to the present time was caused by Defendants' procedural maneuverings, including the

11  lengthy motion practice that resulted in the case being transferred from Florida to this Court.

12  Furthermore, a prior restraint creates an ongoing injury while the restraint is in place, and is

13  equally ripe now as earlier.  The Ninth Circuit has held that the issue of a purported delay in

14  seeking injunctive relief is only "a single factor to consider" and that the courts should be "loath"

15  to withhold preliminary injunctive relief solely on this ground.  *Arc of Calif. v. Douglas*, 757 F.3d

16  975, 990 (9th Cir. 2014) (delay in seeking relief "not particularly probative in the context of

17  ongoing, worsening injuries).  The preliminary injunction motion was filed within a reasonable

18  amount of time from the initial prior restraint and the resulting harm is just as severe now, if not

19  even more so given the impending elections.

20       ### C.    The Balance of Equities Favors Injunctive Relief

21       The purpose of interim injunctive relief is not to "conclusively determine the rights of the

22  parties, but to balance the equities as the litigation moves forward."  *Trump v. International*

23  *Refugee Assistance Project*, 137 S.Ct. 2080, 2087 (2017).  The "balance of equities" test means

24  simply that "the injunction must do more good than harm."  *Alliance for the Wild Rockies v.*

25  *Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011), quoting *Hoosier Energy Rural Elec. Co-op., Inc. v.*

26  *John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir.2009).  Here, the balance of hardships tips

27  decidedly in Plaintiff's favor.  Mr. Trump has been denied access to the YouTube platform that

28  previously provided him the means for rapid dissemination of speech on issues of national

1   importance and central to the core of political debate.  The harm to Mr. Trump and the public, as

2   well as to the integrity of the electoral process itself, is incalculable.  Not only were his First

3   Amendment rights violated publicly, but also those of millions of his followers.  By contrast,

4   Defendants have shown no hardship if the Court temporarily enjoins their continued ban of Mr.

5   Trump and requires a return to the status *quo ante*.  The only impact of injunctive relief would be

6   to require Defendant YouTube to host Mr. Trump's content, as it had done for decades before the

7   heavy hand of the state compelled and encouraged Defendants' censorship.  Defendants have not

8   and cannot make a colorable argument that reinstating Mr. Trump would take considerable time

9   and effort.  Defendants could simply reactivate Mr. Trump's account, much like the "flipping" of

10  a light switch, and Mr. Trump would have access to his prior channels.  Furthermore, any risk of

11  legal liability is slim to non-existent.  Anything Mr. Trump would say as the presumptive head of

12  the Republican Party most likely would be immunized by Section 230 as third-party content.

13  And Defendants have not even attempted to argue that reinstating Mr. Trump would be

14  detrimental to their bottom line.

15       Defendants, with billions of users, claim the reinstatement of this one account violates

16  their free speech rights.  Any impingement on Defendants' "speech"—and it is highly

17  questionable whether users' postings constitute Defendants' speech in any meaningful way—

18  pales in comparison to the impact of Defendants' restraint on the First Amendment rights of the

19  former President, his millions of followers, and the national electorate.  The harm inflicted on Mr.

20  Trump while in office, as a political party leader, and personally, weigh heavily in his favor.

21       **D.    The Public Interest Favors Injunctive Relief**

22       "Courts considering requests for preliminary injunctions have consistently recognized the

23  significant public interest in upholding First Amendment principles." *Id*.  Access to the "vast

24  democratic forums of the Internet" is a First Amendment right. *Reno v. ACLU*, 521 U.S. 844

25  (1997).  That right reaches its zenith where speech affects the election process.  "The right of

26  citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition

27  to enlightened self-government and a necessary means to protect it.  The First Amendment 'has

28  its fullest and most urgent application' to speech uttered during a campaign for political office."

1     *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 339 (2010) (emphasis added),

2     quoting *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989).  Mr.

3     Trump's right to participate meaningfully in the public discourse will remain restrained so long as

4     Defendants continue to ban him from the YouTube platform to avoid the government's threatened

5     repeal of Section 230.  Congress itself has found that "[t]he Internet and other interactive

6     computer services offer a forum for a true diversity of political discourse …."  47 U.S.C. §

7     230(a)(3).  Removing Defendants' prior restraint is inherently in the public interest, especially

8     because the public benefits from a robust marketplace of ideas.  The public also benefits from

9     safeguarding the integrity of the election process by allowing all perspectives to be heard and to

10     inform voters' decisions.  Eliminating two-party debate at the hands of the government, as was

11     done here, should be unimaginable within First Amendment jurisprudence.  Defendants' arbitrary

12     discrimination against speech is contrary to American history, tradition and principles of ordered

13     liberty.

14     **V.      CONCLUSION**

15         For all of the foregoing reasons, Plaintiffs respectfully submit that the motion to dismiss

16     should be denied and their motion for a preliminary injunction granted.  In the event of dismissal,

17     justice requires that leave to amend be granted.[23]

18

19     Dated: January 17, 2022           Respectfully submitted,

20                                 ANDREI POPOVICI (234820)
                                  MARIE FIALA (79676)

21                                 LAW OFFICE OF ANDREI D. POPOVICI, P.C.

22                       By:     */s/ Marie L. Fiala*

23                                Marie L. Fiala

24

25

26     ――――――――――――

27     [23] *See Townsend v. Univ. of Alaska*, 543 F.3d 478, 485 (9th Cir. 2008).  None of the factors that
would militate against granting leave to amend exist here.  *Howey v. U.S.*, 481 F.2d 1187, 1190

28     (9th Cir. 1973) (factors include undue delay, bad faith, futility of amendment, and prejudice to
opposing party).

1

2

3

JOHN P. COALE *(pro hac vice)*
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

4

5

6

7

8

9

JOHN Q. KELLY *(pro hac vice)*
MICHAEL J. JONES *(pro hac vice)*
RYAN TOUGIAS *(pro hac vice)*
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

10

11

12

13

FRANK C. DUDENHEFER, JR. *(pro hac vice)*
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

14

15

16

17

18

19

RICHARD POLK LAWSON (pro hac vice)
GARDNER BREWER MARTINEZ
MONFORT
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gbmmlaw.com
*Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

28